Joseph C. STEFFAN, Appellant,

v.

William J. PERRY, Secretary of Defense, et al., Appellees.

No. 91–5409.

United States Court of Appeals, District of Columbia Circuit.

Argued En Banc May 11, 1994.

Decided Nov. 22, 1994.

As Amended Nov. 22, 1994.

Marc Wolinsky, argued the cause for appellant. With him on the briefs, were Norman Redlich, Vineet Bhatia, and Calvin Steinmetz.

Mark I. Levy, Deputy Asst. Atty. Gen., U.S. Dept. of Justice, argued the cause for appellees. On the brief were Eric H. Holder, Jr., U.S. Atty., and Frank W. Hunger, Asst. Atty. Gen., U.S. Dept. of Justice, Anthony J. Steinmeyer, John C. Hoyle, and E. Roy Hawkens, Attorneys, U.S. Dept. of Justice.

On the brief, for amici curiae American Jewish Committee, et al., was David C. McBride.

On the brief, for amicus curiae American Ass'n of University Professors, were Scott L. Nelson, Ann H. Franke, and Robert C. Post.

On the brief, for amici curiae American Civil Liberties Union AIDS Project, et al., were William B. Rubenstein, Steven R. Shapiro, and Arthur B. Spitzer.

On the brief, for amici curiae NOW Legal Defense and Educ. Fund, et al., was Deborah A. Ellis.

On the brief, for amici curiae National Lesbian and Gay Law Ass'n, et al., was Paul R.Q. Wolfson. David C. Vladeck entered an appearance.

On the brief, for amici curiae Benjamin W. Jordon, et al., was Arthur A. Schulcz, Sr.

On the brief, for amici curiae Geneva College Center for Law and Public Policy, et al., was William A. Woodruff.

On the brief, for amicus curiae The Judge Advocates Ass'n, was Gerald Miller.

On the brief, for amici curiae Naval Aviation Foundation, Inc., et al., was Ronald D. Ray.

Before: MIKVA,* Chief Judge, WALD, EDWARDS,** SILBERMAN, BUCKLEY, WILLIAMS, GINSBURG, SENTELLE, HENDERSON, RANDOLPH, and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Concurring statement filed by Circuit Judge BUCKLEY, with whom RANDOLPH, Circuit Judge, joins.

Concurring statement filed by Circuit Judge RANDOLPH.

Statement concurring in part, dissenting in part, and concurring in the judgment filed by Circuit Judge GINSBURG.

Dissenting opinion filed by Circuit Judge WALD, with whom EDWARDS, Chief Judge, and ROGERS, Circuit Judge, join.

SILBERMAN, Circuit Judge:

Joseph Steffan, a former Navy midshipman who admitted to being a homosexual, appeals from the judgment of the district court sustaining the constitutionality of the regulations pursuant to which he was discharged from the Naval Academy. We affirm.

## I.

Midshipmen enrolled in the Naval Academy are subject to at least two sets of regulations relevant to homosexuality: the Naval Academy's own regulations and the Directives of the Department of Defense applicable to the armed forces generally.

Academy regulations provide a number of "separation criteria" applicable to the "small minority of midshipmen" who "either [do] not perform to standards" or who "possess certain traits which are undesirable in commissioned officers." United States Naval Academy Regulation, COMDTMIDN Instruction 1610.6F Ch–2.15.1 (July 16, 1987).[1] A number of such deficiencies are considered to be "sufficient in and of themselves to warrant separation from the Naval Academy." *Id.* at Ch–2.15.3. The Academy regulations provide a "listing" of those shortcomings, explaining that the "listing is not all-inclusive, but rather serves as examples which severely limit a midshipman's aptitude and potential for commissioned service." *Id.* With regard to "homosexuality," one such concern, the regulations state:

The basis for separation may include previous, prior service or current service conduct or statements. Homosexuality includes the member engaging in, attempting to engage in or soliciting another to engage in a homosexual act or acts. *It also includes statements by the member that he or she is homosexual or bisexual,* or the member marrying or attempting to marry a person known to be of the same biological sex.

*Id.* at Ch–2.15.3.c (emphasis added). The Academy regulations do not further define the term "homosexual."

The Department of Defense Directives applicable to homosexuality are more detailed. They begin with a statement describing their "basis" which provides:

Homosexuality is incompatible with military service. The presence in the military environment of persons *who engage in homosexual conduct or who, by their statements, demonstrate a propensity to engage in homosexual conduct,* seriously impairs the accomplishment of the military mission. The presence of *such members* adversely affects the ability of the Military Services to maintain discipline, good order, and morale; to foster mutual trust and confidence among service members; to ensure the integrity of the system of rank and command; to facilitate assignment and worldwide deployment of service members who frequently must live and work under close conditions affording minimal privacy;

---

* Chief Judge Mikva was a member of the court at the time the case was argued *en banc* but did not participate in the disposition of this case.

** Judge Edwards became Chief Judge prior to the issuance of the opinion.

1. The Academy regulations found in the record postdate Steffan's separation from the Academy. The parties agree, however, that these regulations are identical, so far as relevant to this appeal, to the version existing at the time of the events giving rise to Steffan's suit.

to recruit and retain members of the Military Services; to maintain the public acceptability of military service; and to prevent breaches of security.

DOD Directive 1332.14.H.1.a, 32 C.F.R. Pt. 41, App. A (1991) (superseded) (emphases added). The Directives mandate that a "member shall be separated ... if one or more of the following approved findings is made." *Id.* at 1332.14.H.1.c. One such finding is that "[t]he member has stated that he or she is a homosexual ... unless there is a further finding that the member is not a homosexual." *Id.* at 1332.14.H.1.c.(2). And the term "homosexual" is defined as "a person, regardless of sex, who engages in, desires to engage in, or intends to engage in homosexual acts." *Id.* at 1332.14.H.1.b.(1).

Joseph Steffan enrolled in the Naval Academy in 1983 and successfully completed three of his four years of training, consistently being ranked near the top of his class. During the fall of his senior year, Steffan confided in two fellow midshipmen that he was a homosexual. One of the two reported Steffan's conversation to Academy officials and on the basis of this report the Naval Investigative Service began an investigation of Steffan's homosexuality. Steffan was informed of that inquiry by a fellow midshipman in March 1987. When questioned by Naval investigators, Steffan "invoked his right to remain silent," but did confide his homosexuality to a chaplain in the Academy. Subsequently, in a meeting with the Commandant of the Academy, Steffan stated that he was a homosexual.

On March 24, 1987, the Academy convened a meeting of its Performance Board. At that hearing, Steffan was asked, "I'd like your word, are you a homosexual?" He replied, "Yes, sir." Steffan was then asked whether he had "anything else to add at this point," and he answered "no." Based on this hearing the Performance Board recommended to the Commandant of the Academy that "Steffan be separated from the Naval Academy due to insufficient aptitude for commissioned service." The Board did not state explicitly whether it was relying on the Academy's regulations or the Directives, although its conclusion appears to paraphrase the Acade-

my regulation's wording. The Commandant accepted this recommendation and forwarded it to the Academic Board, chaired by the Superintendent of the Academy. That Board met on April 1 and voted to recommend Steffan's discharge from the Academy to the Secretary of the Navy, again based on "insufficient aptitude for commissioned service."

Following that meeting, Steffan, who was advised by counsel, reached an agreement with the Navy, the terms of which were embodied in a "statement of understanding" signed by Steffan. Steffan acknowledged in the statement that based upon the recommendation of the Academic Board, the Superintendent of the Academy would recommend his discharge. Steffan had been given a choice: either submit a "qualified resignation" or litigate and risk recommendation of a discharge. The official transcript of a midshipman who submits a "qualified resignation" reads "Resigned" rather than "Discharged" as the cause of separation. But the qualified resignation itself includes an acknowledgement by the midshipman that he will be recommended for discharge by the Superintendent if he does not resign. Had Steffan chosen to appeal—presumably to the Secretary of the Navy—and had the Secretary decided that discharge was in order, Steffan's transcript would have revealed "Discharged" as the reason for his termination. Steffan chose the first option and resigned from the Academy. The statement of understanding provided that by choosing to submit his resignation Steffan forfeited "his right to show cause to higher authority why he should not be disenrolled from the Naval Academy." The Secretary of the Navy accepted Steffan's resignation on May 28, 1987. Subsequently, the Naval Investigative Service terminated its uncompleted investigation into possible conduct-related criminal and regulatory violations by Steffan.

Roughly a year and a half after submitting his resignation, Steffan wrote the Secretary of the Navy seeking to withdraw his resignation and resume his studies at the Academy. The Superintendent of the Academy "strongly" recommended to the Secretary that he deny the request. The Superintendent's letter noted that Steffan had made an informed

decision to resign following the conclusion of all the hearings to which he was entitled under Academy regulations. As for the merits of Steffan's request, the Superintendent pointed out that Steffan's admission that he was a homosexual constituted a basis for separation under the Academy regulations, and that the DOD Directives provided that "homosexuality" was incompatible with military service. The Secretary disapproved Steffan's request to withdraw his resignation "in accordance with the recommendation of the Superintendent."

Following that denial, Steffan brought suit in district court. Perhaps because of uncertainty as to whether his discharge was based on the Academy regulations or the DOD Directives, Steffan's complaint sought a declaration generally that "the regulations pursuant to which the Naval Academy acted are unconstitutional on their face and as applied to the Plaintiff herein." Steffan also sought an order "enjoining Defendants from prohibiting [him] from graduating and receiving his diploma from the Academy" and "from denying [him] his commission in the United States Navy." The district court entered summary judgment in favor of the government, and Steffan appealed.[2]

Steffan, whose brief focuses almost entirely on the DOD Directives, argues that the military regulations lack a rational basis because they are simply an attempt to cater to the prejudices of members of the military and because they "punish" homosexuals simply on the basis of their "status" and "thoughts" rather than on the basis of conduct. Steffan concedes—and this concession frames the dispute—that the military may discharge those who engage in homosexual conduct whether on or off duty. The government contends that the regulations are a rational attempt to exclude from the military individuals who engage in, or demonstrate a propensity to engage in, homosexual conduct. The government also asserts that admission into the military of those who engage in such conduct would undermine unit cohesion. And the government defends the regulations as an attempt to protect the privacy of service members.

The record is, to say the least, confusing as to which regulation was applied to Steffan. At various times different bodies within the military hierarchy relied on either the Academy regulation or the Directives, or both. In light of this ambiguity, and because Steffan's complaint clearly sought invalidation of any regulation on which the Naval Academy relied, we will consider the constitutionality of both the Academy regulations and the DOD Directives, as if each alone had provided the basis for Steffan's discharge.

## II. Naval Academy Regulations

The familiar parameters of rational basis review were recently reiterated by the Supreme Court in *Heller v. Doe*, ——— U.S. ———, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).[3] "[R]ational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *Id.* at ———, 113 S.Ct. at 2642 (citations omitted). The government, "moreover, has no obligation to produce evidence to sustain the rationality of a [regulatory] classification." *Id.* Because "a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity," *id.*, "[t]he burden is on the one attacking the [governmental] arrangement to negative every conceivable basis which might support it,' whether or not the basis has a foundation in the record." *Id.* at ———, 113 S.Ct. at 2643 (citations omitted). This presumption of rational-

---

2. A panel of this court reversed the district court decision in *Steffan v. Aspin*, 8 F.3d 57 (D.C.Cir. 1993). The full court then vacated the panel's judgment and ordered that the case be reheard *en banc.*

3. We dismiss Steffan's oblique suggestion, made only in a sketchy footnote and apparently abandoned during oral argument, that heightened scrutiny should be applied because homosexuals constitute a "suspect class" under the Supreme Court's test for identifying such classes. *See Padula v. Webster*, 822 F.2d 97, 103–04 (D.C.Cir. 1987). As we explained in *Padula*, if the government can criminalize homosexual conduct, a group that is defined by reference to that conduct cannot constitute a "suspect class." *See id.* Indeed, Steffan as much as concedes the point by agreeing that the military can ban those who engage in homosexual conduct.

ity does not apply merely to congressional or state legislative schemes, but extends to administrative regulatory action as well, such as the military regulations at issue here. *See Pacific States Box & Basket Co. v. White*, 296 U.S. 176, 186, 56 S.Ct. 159, 163–64, 80 L.Ed. 138 (1935). The classification "is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Communications, Inc.*, —— U.S. ——, ——, 113 S.Ct. 2096, 2098, 124 L.Ed.2d 211 (1993). The dissent is quite mistaken in asserting that under rational basis review the government's position is weakened if it does not produce evidence to support ("demonstrate") its regulatory proposition. *See* dissent at 709. It is hard to imagine a more deferential standard than rational basis, but when judging the rationality of a regulation in the military context, we owe even more special deference to the "considered professional judgment" of "appropriate military officials." *Goldman v. Weinberger*, 475 U.S. 503, 509, 106 S.Ct. 1310, 1314, 89 L.Ed.2d 478 (1986).

■ Under this line of precedent we are required to ask two questions of the regulations. First, are they directed at the achievement of a legitimate governmental purpose? Second, do they rationally further that purpose? The first of these questions is not even in dispute in this case. As we have noted, Steffan concedes that the military may constitutionally terminate service of all those who engage in homosexual conduct—wherever it occurs and at whatever time the conduct takes place.[4] Counsel at oral argument further admitted, in connection with a discussion focused on the DOD Directives, that the military could ban even those who reveal an "intention" to engage in such conduct. It is common ground, then, that the regulations would be serving a legitimate purpose by excluding those who engage in homosexual conduct or who intend to do so.[5]

The dispute between the parties is thus limited to the question whether the regulations (focusing now on the Academy regulations), by requiring the discharge of those midshipmen who describe themselves as homosexual—whether or not the Academy has information establishing that an individual has engaged in homosexual conduct or intends to do so—are rational. Steffan first argues that there is no necessary factual connection between such self-description and such conduct. But Steffan relies primarily on a more subtle and novel argument. Even if the government could rationally, as a factual matter, draw a connection between the statement and the conduct, other legal considerations prevent the government from so doing. The military may not, according to Steffan, "punish" homosexuals solely on the basis of their "status." Nor may the military presume that self-declared homosexuals will actually engage in homosexual conduct, for such conduct is illegal under the Code of Military Justice. (Sodomy is prohibited under 10 U.S.C. § 925 (1988).) Such a presumption—that someone will actually break the law—is inconsistent, he argues, with our legal traditions.

We consider first whether the Academy regulation has a rational factual basis. The appropriate question, it seems to us, is whether banning those who admit to being homosexual rationally furthers the end of banning those who are engaging in homosexual conduct *or are likely to do so*. The Academy can treat someone who intends to pursue homosexual conduct in the same manner as someone who engages in that conduct, because such an intent is a precursor to the

---

4. *See Dronenburg v. Zech*, 741 F.2d 1388, 1398 (D.C.Cir.1984) (Navy's "policy requiring discharge for homosexual conduct is a rational means of achieving ... legitimate interests"); *Beller v. Middendorf*, 632 F.2d 788, 812 (9th Cir.1980) (upholding "the Navy's blanket rule requiring discharge of all who have engaged in homosexual conduct"), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981).

5. The regulations state that homosexuality "limit[s] a midshipman's aptitude and potential for *commissioned* service" (emphasis added), which might suggest that it would be particularly troublesome for an officer to be a declared homosexual. But the government at oral argument expressly denied that the regulations were crafted with any specific concern for officers. In light of *Goldman*'s admonition that we owe special deference to the "considered professional judgment" of the military officials, we do not think it open to us to draw any distinction between officers and enlisted members.

proscribed conduct and makes subsequent homosexual conduct more likely than not. And the military may reasonably assume that when a member states that he is a homosexual, that member means that he either engages or is likely to engage in homosexual conduct. The inference seems particularly valid in this case because Steffan made no attempt to clarify what *he* meant by the term. He did not specify (nor was he asked by the Board) whether he had engaged in homosexual conduct in the past, whether he was presently engaged in homosexual conduct, whether he intended to engage in homosexual conduct in the future, or whether all three were true. Indeed, as we noted, he had previously invoked his right to remain silent when questioned on these subjects. Nor did Steffan ever indicate that his answer to the Board referred to homosexual orientation as a concept implicating only wants or thoughts unrelated to conduct—a meaning that he now suggests was a possible interpretation of the term and which the dissent embraces. He left it to the Board to draw what he apparently thought were the ordinary inferences the term homosexual suggests. These ordinary inferences are reflected in the Academy regulations and were the apparent bases for the Board's conclusions.[6] The dissent's deconstruction of Steffan's terse response overlooks the obvious point that Steffan assumed that the Board would fully understand what he meant.

■ Admittedly, it is conceivable that someone would describe himself as a homosexual based on his orientation or tendencies (and, perhaps, past conduct), notwithstanding the absence of any ongoing conduct or the probability of engaging in such conduct. That there may be exceptions to the assumption on which the regulation is premised is irrelevant, however, so long as the classification (the regulation) in the run of cases furthers its purpose, and we readily conclude

that it does. As then-Judge Kennedy pointed out in *Beller v. Middendorf*, 632 F.2d 788 (9th Cir.1980), *cert. denied*, 454 U.S. 855, 102 S.Ct. 304, 70 L.Ed.2d 150 (1981):

> Nearly any statute which classifies people may be irrational as applied in particular cases. Discharge of the particular plaintiffs before us would be rational, under minimal scrutiny, not because their particular cases present the dangers which justify Navy policy, but instead because the general policy of discharging all homosexuals is rational.

*Id.* at 808 n. 20 (citation omitted). The rule of law presupposes the creation of categories.

■ The military thus may rely on presumptions that avoid the administratively costly need to adduce proof of conduct or intent, so long as there is a rational basis for believing that the presumption furthers that end. And the military certainly furthers its policy of discharging those members who either engage in, or are likely to engage in, homosexual conduct when it discharges those who state that they are homosexual. The special deference we owe the military's judgment necessarily affects the scope of the court's inquiry into the rationality of the military's policy. *Compare* dissent at 709. Whether a certain course of conduct is rational does not depend solely upon the degree of correlation that exists between a surface characteristic and a corresponding hidden trait. For the question whether the degree of correlation justifies the action taken—*i.e.*, whether it is rational—necessarily depends on one's assessment of the magnitude of the problem the action seeks to avoid. The military is entitled to deference with respect to its estimation of the effect of homosexual conduct on military discipline and therefore to the degree of correlation that is tolerable. Particularly in light of this deference, we think the class of self-de-

---

6. The Board discharged Steffan solely on the basis of his admission of homosexuality. Thus, the dissent's claim that a Naval Investigative Service inquiry into Steffan's conduct led to "no evidence" of homosexual activity is misleading. *See* dissent at 701 n. 1. Steffan actually refused to answer conduct-related questions; for purposes of discharge, the Navy presumably would have been justified in drawing adverse inferences

as to Steffan's conduct from this refusal. *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1557–58, 47 L.Ed.2d 810 (1976); *Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n. 5, 97 S.Ct. 2132, 2137 n. 5, 53 L.Ed.2d 1 (1977) (precedent "permit[s] an inference to be drawn in a civil case from a party's refusal to testify"). But that was not the ground the Navy relied on.

scribed homosexuals is sufficiently close to the class of those who engage or intend to engage in homosexual conduct for the military's policy to survive rational basis review.

■ Because removing from the military all those who admit to being homosexual furthers the military's concededly legitimate purpose of excluding from service those who engage in homosexual conduct, Steffan's argument at bottom must be based on the notion that the classification drawn by the military is impermissibly over-inclusive—that the military may not presume that all admitted homosexuals will engage in homosexual conduct because some homosexuals would not. However,

> courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it "is not made with mathematical nicety or because in practice it results in some inequality." "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific."

*Heller,* —— U.S. ——, 113 S.Ct. at 2643 (quoting *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) and *Metropolis Theatre Co. v. Chicago,* 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730 (1913)).[7]

Steffan seeks to end-run this analysis by arguing that a prohibition triggered simply by an admission of homosexuality is one based on "status" rather than conduct, and therefore is legally impermissible *regardless*

of its rational relationship, as a factual matter, to the military's objective. As the panel that initially decided this case put the point, "America's hallmark has been to judge people by what they do, and not by who they are." *Steffan v. Aspin,* 8 F.3d 57, 70 (D.C.Cir.1993), vacated and rehearing en banc granted (D.C.Cir. Jan. 7, 1994). In our view, however, Steffan's attempt to invoke a rule against "punishment" based on "status" is unavailing, because it derives from a misunderstanding of constitutional law.

■ It is true that the Constitution forbids criminal punishments based on a person's qualities—we assume that this is what is meant by "status"—rather than on his or her conduct. *See Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). Yet, this proposition has never meant that employment decisions—which is what *this* case is about—cannot be made on such a basis. One cannot be put in jail for having been born blind (although a blind person who drives a truck and kills someone could be jailed for his act). But it obviously would be constitutional for the military to prohibit blind people from serving in the armed forces, even though congenital blindness is certainly a sort of "status." The logic of Steffan's argument and of the original panel's decision—that "America's hallmark" prohibits "punishment" (which term is meant to encompass discharge decisions) based on a person's "status"—would mean that the military acts unconstitutionally if it refuses to enlist blind individuals.

■ It is asserted that one does not choose to be homosexual and that therefore

---

**7.** In *Meinhold v. United States Dept. of Defense,* 34 F.3d 1469 (9th Cir.1994), the court addressed the "desires" portion of the DOD Directive in a case involving a serviceman who said on national television, "Yes, I am in fact gay." A discharge panel was convened to consider Meinhold's statement and as far as we can determine Meinhold did not appear before the Board. The Ninth Circuit construed the "desires" language to mean something akin to intent, and therefore concluded that separation could be based on a statement identifying oneself as a homosexual only when it was accompanied by evidence of conduct or intent. Finding that Meinhold's televised announcement failed to provide any such evidence, *compare infra* at 694 n. 18 (discussing

the appropriateness of the *Meinhold* court's factual finding), the court determined that Meinhold's discharge was illegal under the Navy's own regulations.

The Ninth Circuit accepted Meinhold's characterization that the class of persons at issue was those "who say they are gay but have not acted in accordance with their propensity in the past." In our view, however, the proper characterization of the class is persons who say they are gay, but as to whom the military has no additional evidence as to their conduct. The *Meinhold* court also did not consider the rationality of treating all persons who identify themselves as homosexuals as likely violators of the prohibition on homosexual conduct.

it is unfair for the military to make distinctions on that basis. But whether or not one's homosexuality is genetically predetermined, one's height certainly is. Steffan conceded at oral argument that the Navy's maximum height restrictions are constitutional because they rationally further a legitimate naval purpose. That concession amounts to an admission that employment decisions based on a person's *characteristics* are subject to the same analysis as decisions based on a person's *conduct*. Both are tested to see whether they rationally further a legitimate purpose.

■■■ The controversy before us is quite analogous to *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (per curiam), in which the Supreme Court upheld a mandatory retirement age of 50 for police officers on the grounds that the classification rationally furthered the government's purpose of excluding those who lacked the physical conditioning to be officers. *See id.* at 314–17, 96 S.Ct. at 2567–69. In other words, the Court upheld a classification based on "status"—after all, a classification based on age turns on how old someone is, not on what he can do—that was aimed prophylactically at preventing the risk of unsatisfactory *conduct*. The connection between homosexuality and homosexual conduct is at least as strong (indeed, it seems much stronger) as the relationship upheld in *Murgia* between age—a paradigmatic "status"—and unsatisfactory job performance. The dissent would distinguish *Murgia* and our other examples on the grounds that a self-declared homosexual can control his sexual drives, whereas no one can hold back the process of aging. But people can and do manage to keep in superb physical condition even in advanced age. *Murgia* upheld the mandatory retirement age for police officers as reasonable not because every officer becomes infirm at 50, but rather because it was permissible to require retirement in every case despite the possible alternative of using medical examinations to indicate which officers over 50 were still fit to serve. The state's method was over-inclusive, but it was not irrational. *Id.* at 314, 96 S.Ct. at 2567.

Similarly, in this case, the possible existence of some self-identified homosexuals who do not and would not act on their desires in a military or civilian setting does not render irrational a regulation that reaches the class as a whole. Just as age can be used as a rough proxy for diminishing physical capacities, here we think that a statement that one is a homosexual can rationally be used by the Navy as a proxy for homosexual conduct— past, present, or future.

The government's right to rely on a classification based on identifiable characteristics as a proxy for conduct was also sanctioned in *New York City Transit Auth. v. Beazer*, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979), in which the Court found that the Transit Authority's policy of barring employment to drug addicts was rational as applied to methadone users enrolled in a treatment program. Given the "legitimate inference that ... a degree of uncertainty [regarding future drug use while still in the program] persists," *id.* at 591, 99 S.Ct. at 1368, the government was entitled to assume that an addict *might engage in unacceptable conduct* while on the job. The dissent argues that the presumption in *Beazer* was based on indications of "past conduct," since one would not be in a methadone program unless one had previously taken drugs. Dissent at 715. But surely the logic of the opinion indicates that the case would not have been decided differently if the Transit Authority had excluded as well those who *stated* that they were heroin addicts. Indeed, a statement can be a more reliable predictor of future (or present) behavior than evidence of past conduct. The unqualified statement "I am a homosexual" might well be more indicative of future homosexual conduct than a determination that someone had in the past engaged in such conduct, perhaps under unusual conditions or in brief experimentation. In either case, a correlation with future conduct is certainly to be expected; the only issue is the degree of correlation. As we have said, we are persuaded that in this case the correlation is more than sufficient to justify the government's policy.[8]

8. The dissent would also distinguish *Beazer* on the basis of the district court's findings that some

■ To be sure, it would not pass even rational basis review for the military to reject service members because of characteristics—such as race or religion or the lack of inherited wealth—that have absolutely no bearing on their military service.[9] Homosexuality, by contrast, is not irrelevant to homosexual conduct. And once Steffan concedes that the military may constitutionally seek to prevent the latter, his analogy to a hypothetical exclusion of those of a particular race or religion fails.

■ Nevertheless, Steffan, in order to make his point, would have us see homosexual status—which is all that he should be thought to have acknowledged—as *conceptually* unrelated to homosexual conduct. Although there may well be individuals who could, in some sense, be described as homosexuals based strictly on an inchoate orientation, certainly in the great majority of cases those terms are coterminous.[10] Homosexuality, like all forms of sexual orientation, is tied closely to sexual conduct. As the Seventh Circuit reasoned:

> It is true that actual lesbian conduct has not been admitted by plaintiff on any particular occasion, and the Army has offered no evidence of such conduct. Judge Gordon found no reason to believe that the lesbian admission meant that plaintiff was likely to commit homosexual acts. We see it differently. Plaintiff's lesbian acknowledgement, if not an admission of its practice, at least can rationally and reasonably be viewed as reliable evidence of a desire and propensity to engage in homosexual conduct. Such an assumption cannot be said to be without individual exceptions, but it is *compelling evidence* that plaintiff has in the past and is likely to again engage in such conduct. To this extent, therefore, the regulation does not classify plaintiff based merely upon her status as a lesbian, but upon reasonable inferences about her probable conduct in the past and in the future. The Army need not shut its eyes to the practical realities of this situation, nor be compelled to engage in the sleuthing of soldiers' personal relationships for evidence of homosexual conduct in order to enforce its ban on homosexual acts, a ban not challenged here.... The Army need not try to fine tune a regulation to fit a particular lesbian's subjective thoughts and propensities.

*Ben–Shalom v. Marsh,* 881 F.2d 454, 464 (7th Cir.1989), *cert. denied,* 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990) (emphasis added).

■ The dissent insists that homosexual self identification and homosexual conduct are not coterminous, or at least have not been proved "in this case or any other case" to be coterminous. Dissent at 709. As we have already noted, however, the dissent's reasoning—that the government's failure to produce evidence ("demonstrate") that its inference is "rooted in reality" undermines its position—is predicated on an incorrect view of constitutional law, for which the dissent miscites *Heller, see id.,* and relies on recent district court decisions challenging the military's ban on homosexuals which simply represent an undisciplined rebellion against the governing constitutional doctrine. *Id.* at 711–12. It is not the government's burden to establish the exact degree of correlation between those who describe themselves as homosexual and those who engage in homosex-

---

of the participants in the methadone treatment program exhibited physical symptoms that impaired their capacity for employment. Dissent at 715. The Supreme Court did not, however, rely on this basis in upholding the policy; indeed, the Court recognized that some participants in the program, if "examined individually, satisfied the Transit Authority's employment criteria," but nevertheless held that "it is of no constitutional significance that the degree of rationality is not as great with respect to certain ill-defined subparts of the classification as it is with respect to the classification as a whole." *Id.* at 593, 99 S.Ct. at 1370 (citation omitted).

9. Classifications based on race or religion, of course, would trigger strict scrutiny.

10. The dissent mistakenly asserts that our view on this issue is contradicted by the DOD Directives and the government's position in *Selland v. Aspin,* 832 F.Supp. 12, 13 (D.D.C.1993). Dissent at 710. We repeatedly emphasize that the military's practice of discharging service members who state that they are homosexual, based on an inference of future conduct, is permissible because the inference is rational in the *run of cases.* Contrary to the dissent's assertions, the existence of possible individual exceptions to the rule does not affect our equal protection analysis.

ual conduct—let alone to show that the concepts are coterminous. Indeed, "the theory of rational basis review ... does not require the [government] to place *any* evidence in the record." *Heller*, —— U.S. at ——, 113 S.Ct. at 2642 (emphasis added). Neither appellant nor the dissent, it must be emphasized, actually denies that there is a correlation (we are, after all, speaking of those who openly identify themselves as homosexuals, not of those who might simply experience what might be interpreted as a fleeting homosexual impulse). The dissent does, however, quote approvingly from a district judge who asserted, *inter alia*, that "there is almost no correlation between an individual's sexual 'orientation' and his or her sexual conduct." Dissent at 711–12. Even defining "orientation" in the broadest possible terms, we think this assertion is preposterous.

The government's understanding of what is meant when an individual identifies himself or herself without qualification as a homosexual is identical to the view of Judge Reinhardt, perhaps the federal judiciary's most vocal proponent of constitutional protections for homosexuals in military or civilian life. *See, e.g.,* Reinhardt, *The Court and the Closet: Why Should Federal Judges Have to Hide Homosexuality?*, Washington Post, Oct. 31, 1993, at C3. In his dissent in *Watkins v. United States Army*, 847 F.2d 1329, 1353 (9th Cir.1988), in which he sharply criticized *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), he said:

> Even if we define the class as those who have a 'homosexual orientation,' its members will consist principally of active, practicing homosexuals....
>
> ... To pretend that homosexuality or heterosexuality is unrelated to sexual conduct borders on the absurd. What distinguishes the class of homosexuals from the class of heterosexuals is not some vague 'range of emotions,' but the nature of the

member's sexual proclivities or interests....

... Whether the group is defined by status or by conduct, its composition is essentially the same.

*Id.* at 1360–61 & n. 19.[11]

█ We need not endorse Judge Reinhardt's unequivocal position or his harsh criticism of the reasoning that is *now* relied upon by our dissenting colleagues. It is sufficient to recognize that the government's presumption, as embodied in the Academy regulations, is certainly rational given that the human sexual drive is enormously powerful and that an open declaration that one is a homosexual is a rather reliable indication as to the direction of one's drive.

█ The dissent would employ the military's new policy, adopted in 1993, (which of course is not formally before the court) as an indication that the military has implicitly conceded that the Academy regulations (and former DOD Directives) were irrational. That proposition is a *non sequitur*. In light of the extremely deferential nature of rational basis review, there would always be a range of policy choices that would meet that standard. A shift from one of those choices to another hardly suggests that the government believes the former was unconstitutional. In any event, under the new policy, Steffan's statement—which we again emphasize is what this case is about—would be taken to mean just what the Academy Board apparently thought it meant. The new Directives provide that a "statement by a Service member that he or she is a homosexual ... creates a rebuttable presumption that the Service member engages in homosexual acts or has a propensity or intent to do so." DOD Directive 1332.14.H.1.b.(2) (Dec. 22, 1993). To be sure, under the new policy, the government explicitly disavows any concern with a service member's totally private homosexual "orientation," meaning his "sexual attrac-

11. Lambda, the gay rights organization representing Steffan, appeared as *amicus* in *Bowers*. Arguing against the constitutionality of criminalizing homosexual sodomy, it asserted that the "regulation of same sex behavior constitutes the total prohibition of an entire way of life" because homosexuality is inexorably intertwined with "homosexual conduct." *See Amicus Curiae* Brief on Behalf of Respondents by Lambda Legal Defense and Education Fund, Inc. at 23, n. 28, *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (No. 85–149) (emphasis added).

tions"; but however that language might be applied in future cases, it obviously would have no relevance to a service member who, like Steffan, has disclosed that he is a homosexual.

Certainly, individuals like Steffan who identify themselves as homosexual in a military setting—where a declaration of homosexuality is grounds for discharge—convey the impression that they are not in doubt as to the direction of their sexual drive. The inference drawn by the government in this sort of case is thus even stronger than it might be in civilian life, where it is more conceivable that an individual would experiment with such an identification. The dissent asserts that the fear of discharge would prevent a self-identified homosexual from actually engaging in homosexual conduct, *see* dissent at 712, but its reasoning overlooks the point that such fears, if present, would presumably also have discouraged the initial statement, particularly if a person were unsure of his or her identification and its relationship to the military's definition. Given that the military's response is the same in each case—discharge—it is unclear why the dissent thinks the deterrent would affect only the later decision.

 Even if the assumption that declared homosexuals will engage in homosexual conduct is reasonable in certain contexts, Steffan maintains that it is nevertheless impermissible for the military to act on that assumption; it implies that service members will engage in criminal misconduct—violate the Uniform Code of Military Justice. Steffan argues that such an assumption flies in the face of core traditions of American jurisprudence. Although Steffan's argument has a certain superficial attractiveness, it seems to us that

upon close examination it is more clever than real. First of all, the Academy regulations reach all homosexual conduct—a category of actions that may include conduct that is not illegal under the Code, which proscribes sodomy. More important, we think that when a service member declares or openly admits that he is a homosexual without any explanation, the Academy may rationally take that statement, at least for purposes *unrelated* to criminal enforcement, as highly likely to be an admission of homosexual conduct or intent. In a discharge proceeding, the Navy need not conduct an inquisition to test whether a particular midshipman possesses an idiosyncratic view of the term. When an individual's statement can reasonably be taken to evidence a propensity to engage in certain conduct, the military may certainly take that individual at his word.

The authority Steffan presents to support his point does not bear on his case. Steffan principally relies on *Jacobson v. United States,* —— U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992), in which the Supreme Court overturned petitioner's conviction on charges of receiving pornography through the mail, holding that government agents "may not originate a criminal design" or "implant in an innocent person's mind the disposition to commit a criminal act." *Id.* at ——, 112 S.Ct. at 1540. But the government's obligation to prove predisposition in an entrapment prosecution has no relevance to whether the military may assume that a serviceman identifying himself as a homosexual is likely to engage in homosexual conduct.[12] This is not a criminal case; Steffan was not charged with misconduct, and therefore the constitutional protections we accord criminal defendants are not applicable.[13]

---

12. The dissent's reliance on *Robinson v. California, supra,* is also misplaced. The Court's holding in that case that a state statute criminalizing the "illness" of narcotics addiction was cruel and unusual punishment bears little legal or factual similarity to this case. The *Robinson* Court had no occasion to consider the rationality of an *employment* decision based on statements from which the probability of future conduct can easily be inferred.

13. The other cases relied on by Steffan are similarly inapposite. *Noto v. United States,* 367 U.S. 290, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961), in-

volved the sufficiency of evidence necessary to convict a Communist Party member under the Smith Act for advocating the violent overthrow of the government. *United States v. Robel,* 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967), held that a criminal statute prohibiting employment of Communist Party members at certain defense facilities violated the guarantee of freedom of association. Both these First Amendment cases require the government to allege particular evidence of guilt against individual members of political organizations in criminal prosecutions; they do not affect our analysis of wheth-

Steffan claims that, in contrast to its assumption about homosexuals' behavior, the military does not make a similar assumption with respect to heterosexuals and that therefore the inference directed against homosexuals reflects impermissible bias. Acts of sodomy by heterosexuals are also misconduct under the Code of Military Justice, and yet the military does not presume that heterosexuals will engage in that practice.[14] It is not clear just what military procedure Steffan asserts is based on this allegedly contrary assumption about heterosexuals. In any event, as the government responds, to criminalize one form of sexual conduct between heterosexuals is not the same as prohibiting all sexual conduct between homosexuals; the latter puts a much greater restraint on sexual drives—one that the military reasonably believes is difficult, if not impossible, to maintain. The military presumes, in parallel fashion, that homosexuals are as likely to engage in homosexual conduct as heterosexuals are likely to engage in heterosexual conduct. Homosexuals and heterosexuals are, however, differently situated in that heterosexuals have a permissible outlet for their particular sexual desires whereas homosexuals in the military do not. The temptations facing heterosexuals, moreover, are less compelling than those that homosexuals would encounter, because men and women are quartered separately. They are separated because the military rationally assumes that heterosexuals, like homosexuals, are likely to act in accordance with their sexual drives whether or not such actions would be misconduct. (Under the dissent's logic—that it is irrational to infer sexual conduct from indicia of sexual tendencies—even separating men and women could be thought unconstitutional.[15]) The military obviously could not elimi-

nate the difficulties of quartering homosexuals with persons of the same sex by totally segregating homosexuals. Besides the troubling implications of such a separation, putting all homosexuals together would not diminish their mutual sexual attractions. The military's concerns, then, do not stem from an irrational bias or, as the dissent suggests, "naked stereotypes," dissent at 708, 712; rather, heterosexuals and homosexuals are treated differently because the means at the military's disposal for dealing with the natural phenomenon of sexual attraction differ for the two.

We have said that this is not a criminal case. It is also not a First Amendment case. Steffan was not discharged from the Navy because he expressed sympathy for homosexuals or because he openly opposed the Navy's policy of banning homosexuals, nor has he claimed a First Amendment violation. (To be sure, even the First Amendment must yield at times to the exigencies of military life. *Goldman v. Weinberger*, 475 U.S. 503, 507–09, 106 S.Ct. 1310, 1313–14, 89 L.Ed.2d 478 (1986); *Brown v. Glines*, 444 U.S. 348, 354, 100 S.Ct. 594, 599, 62 L.Ed.2d 540 (1980) (*quoting Parker v. Levy*, 417 U.S. 733, 759, 94 S.Ct. 2547, 2563, 41 L.Ed.2d 439 (1974))). Steffan's "thoughts" were not put in issue by the Naval Academy. He was not discharged for imagining the demise of the President or even the Superintendent of the Academy. *See* dissent at 713–15. Thus, most of the cases relied on by the dissent, both the Supreme Court and circuit opinions, are utterly inapposite.[16]

\* \* \*

We recognize that the government's policy—that homosexuals (using the ordinary meaning) may not serve in the armed

---

er the military's employment restrictions in this case are rational under the Equal Protection Clause.

**14.** As we have said, however, the Navy's presumption of homosexual conduct does not necessarily imply illegal acts, *i.e.*, sodomy. Although the dissent implies that there may be significant distinctions, *see* dissent at 705–06 n. 8, Steffan, for his part, never distinguished in his concession between sodomy and other homosexual conduct.

**15.** As a sex-based classification, separate quartering for men and women would be reviewed under the more stringent intermediate-level equal protection standard.

**16.** While the Fourth Circuit did supplement its First Amendment analysis in *Gay Alliance of Students v. Matthews*, 544 F.2d 162, 167 (4th Cir.1976), with the brief statement that withholding recognition from a gay students' group also denied equal protection, it did so under a "tailored to serve a substantial government interest standard," not rational basis review.

forces—is quite controversial. The issue is politically devisive. We think, however, that Steffan's claim that the government cannot rationally infer that one who states he or she is a homosexual is a practicing homosexual, or is at least likely to engage in homosexual acts, is so strained a constitutional argument as to amount to a basic attack on the policy itself.[17] And we think that the language used by the dissent—its invocation of "discrimination," dissent at 715 n. 20, "fundamental due process," *id.,* and "fundamental impediments deeply rooted in our constitutional jurisprudence," *id.* at 709 —represents a rhetorical effort to break out of the narrow constraints of the court's role on rational basis review.

### III. DOD Directives

#### A.

The DOD Directives use somewhat different wording to define a homosexual than does the Academy regulation:

> Homosexual means a person, regardless of sex, who engages in, desires to engage in, or intends to engage in homosexual acts....

DOD Directive 1332.14.H.1.b.(1), 32 C.F.R. Pt. 41, App. A (1991) (superseded). Steffan's lawsuit takes aim primarily at the Directives because the phrase "desires to engage in" is claimed to extend the definition of homosexual into the realm of a service member's private thoughts. The DOD regulations are unconstitutional, Steffan argues, because they allow for the expulsion of service members on the basis of their inner feelings alone. They are irrationally overbroad—and thus fail rational basis review—because they define the class of excludable persons to reach those who merely harbor homosexual impulses, without requiring any indications that such impulses are likely to be reflected in admittedly impermissible homosexual conduct. Steffan's complaint purports to challenge the Directives as applied *and* on their face (although his brief is ambiguous on the point).

As we have noted, however, Steffan's counsel agreed at oral argument that the Directives constitutionally could be applied to a service member who stated that he was a homosexual and who meant by the statement that he actually engaged in homosexual conduct. This concession, that some situations exist to which the Directives may constitutionally be applied, renders Steffan's facial challenge defective. "[U]nder our constitutional system courts are not roving commissions assigned to .pass judgment on the validity of the Nation's laws." *Broadrick v. Oklahoma,* 413 U.S. 601, 610–11, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973). For this reason, "[c]onstitutional judgments ... are justified only out of the necessity of adjudicating rights in particular cases." *Id.* at 611, 93 S.Ct. at 2915. Accordingly, outside the First Amendment context, *see, e.g., Gooding v. Wilson,* 405 U.S. 518, 520–22, 92 S.Ct. 1103, 1105–06, 31 L.Ed.2d 408 (1972), a "facial challenge to a legislative Act ... must establish that *no* set of circumstances exists under which the Act would be valid." *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987) (emphasis added). By his own admission, Steffan cannot meet this requirement.

Where, as here, a statute or regulation has some concededly constitutional applications, a successful challenger must demonstrate that the statute is unconstitutional as "applied to the particular facts of [his] case." *Id.* at 745 n. 3, 107 S.Ct. at 2100 n. 3. To this end, we are told, *see* Appellant's Reply Br. at 10, that when Steffan answered affirmatively to the question whether he was a homosexual he was obliged to reveal, and therefore must be . deemed to have revealed, his innermost desires. Steffan, however, has not at any stage in this litigation sought to show why and how the DOD Directives were actually applied to him in an unconstitutional manner. He never disputed that he was a homosexual; indeed, he forthrightly admitted it at his hearing and declined to add anything to his response. (It will be recalled that he had actually invoked his right to refuse to discuss the matter with Naval investigators.) He did

---

**17.** Because we find the Academy regulations rationally justified on these grounds, we see no

need to discuss other possible rationales presented by the government or that we might conceive.

not point to that part of the DOD Directives' definition of homosexual that includes those persons who "desire[ ] to engage in ... homosexual conduct" as the reason for his answer. He never gave any explanation as to what he meant, or did not mean, when he stated that he was a homosexual. And he never claimed (even when he wrote to the Secretary of the Navy a year and a half after his resignation) that it was only the "desires" component of the Directives—the alleged unconstitutionally overbroad aspect—that enmeshed him in the definition.

Normally, a case such as this would arise as an appeal from a military adjudication under the Administrative Procedure Act. The APA provides a right to review agency action only to those "adversely affected or aggrieved" by such action, *see* 5 U.S.C. § 702 (1988), and in order to establish a grievance resulting from the application of a regulatory term, a party would first have to show whether and how that term was applied to him. This is all the more so when the petition for review is based on a claim of unconstitutionality. *Continental Air Lines, Inc. v. Department of Transp.*, 843 F.2d 1444, 1455–56 (D.C.Cir.1988) (constitutional challenges to congressional statute must be raised in agency proceedings to be preserved for review by appellate court); *Meredith Corp. v. FCC*, 809 F.2d 863, 872–74 (D.C.Cir. 1987) (remanding for agency initially to address constitutional challenges to its own policy). Although this case comes to us as a collateral challenge based on the Constitution rather than the APA, that route does not alter the desirability of an agency elucidation as to the meaning of that part of the Directive that Steffan claims was crucial to his discharge. Where on the spectrum between "intentions" and mere "fantasies" does the military's interpretation of the word "desires" fall? Because the only administrative bodies that can decide that question were never pressed by Steffan to do so—indeed

were never even alerted to the issue—we cannot know.

Only on appeal (almost seven years after his resignation) did Steffan fix upon the "desires" language in the definition as the root of his legal difficulty. If the Navy's procedures (which have not been brought before us) require internal appeal before resorting to collateral challenge, *see Darby v. Cisneros,* — U.S. ——, ——, 113 S.Ct. 2539, 2548, 125 L.Ed.2d 113 (1993), it might well have been thought that Steffan had failed to exhaust his administrative remedies by agreeing to the disposition of his case at the Academy. The Navy did raise this precise argument in a recent Ninth Circuit case, *Meinhold v. United States Dept. of Defense,* 34 F.3d 1469 (9th Cir.1994), in which a naval officer was dismissed under a ruling of a Discharge Board (the lowest level in the administrative proceedings) for having stated on national television, "Yes, I am in fact gay." The Navy pointed out that further administrative proceedings appealing the decision to the Board for Correction of Naval Records would provide a record for judicial review and would clarify confusion as to the regulatory definition of "homosexual," which the parties disputed. The Ninth Circuit, rather astoundingly in our view, rejected the exhaustion argument on the grounds that the Discharge Board had been advised that a service member is conclusively deemed to be a homosexual if he makes a statement to that effect (which, of course, is not what the DOD Directives themselves said, *see* DOD Directive 1332.20.H.1.c.(2), (providing for separation on the basis of statement "unless there is a further finding that the member is not a homosexual")), and that the Navy had not indicated that the disposition of the case would be any different on appeal. *Meinhold,* 34 F.3d at 1477. It should be obvious that this sort of reasoning would destroy the exhaustion-of-remedies doctrine.[18]

---

18. Paradoxically, the court proceeded to advance its own interpretation of the "desires" language of the DOD Directives, concluding that—in order to avoid a supposed but not clearly identified constitutional issue—it must mean that a statement of homosexuality "mandates separation only when that statement should be interpreted as portraying a concrete, expressed desire to commit homosexual acts." Then, in an extraordinary reversal of the role of an appellate court, the Ninth Circuit determined, without remand to the Department or the district court, that as a matter of *fact* Meinhold's statement manifested no such "concrete" desire under the circumstances (presumably because made on national television). *Id.* at 1479.

In this case, although the government did in fact assert an exhaustion defense of some sort, it was rejected by the district court and the issue was not raised on appeal. It will be recalled also that the documents Steffan signed, with the advice of counsel, to facilitate his resignation specifically acknowledged that he would risk discharge if he pressed his appeal and for that reason explicitly waived his right to seek review. The government apparently initially asserted a variation of a waiver defense as well, which was also rejected and not appealed. As neither the waiver nor exhaustion arguments are before us, it would not be appropriate for us to consider them *sua sponte. Cf. National Wildlife Fed'n v. Burford,* 835 F.2d 305, 316–18 (D.C.Cir.1987) (discussing district court's discretion to enforce exhaustion claims raised against plaintiffs by nongovernmental third parties).

■ Still, in making an as-applied challenge, it is Steffan's burden—and the government does make this point—to show exactly how the Directives were applied against him illegally. Steffan seeks to meet this obligation by admitting that he entertains homosexual desires and arguing that such admission alone would be *sufficient* under the DOD Directives to cause his termination. The difficulty with Steffan's inventive position, however, is that even under his theory of the case he would only have a constitutional claim if his statement had meant that he harbored homosexual desires *and yet* had neither engaged in or intended to engage in homosexual conduct. Otherwise, the desires portion of the definition would not have been crucial to his discharge.

Steffan insists that the Navy never alleged that he engaged in homosexual acts or intended to do so. That is true but, it seems to us, quite beside the point. After all, the Navy never alleged that Steffan had homosexual "desires." Steffan openly admitted his homosexuality, and under the circumstances there was no reason for the Navy to proceed further. If Steffan had wished to explain that his admission was based only on his desires—and not his conduct or intentions—he could have done so and joined the issue. The government would have been obliged, in that event, either to rest on his explanation (more naturally, he would have been at least asked what he meant by "desires") or to pursue further evidence of intent or conduct. In that manner, one could subsequently determine whether the Navy had relied on only the desires portion of the definition and therefore whether it had actually been applied to Steffan.

Indeed, the government in its brief before this court, while conceding that the word "desires" may be ambiguous "in isolation," tells us that the Department of Defense interprets the term as "conduct related," *i.e.,* bordering on intent, and referring to the actual "prospect of future acts." If the Directives were interpreted in this way—notwithstanding their different language—to mean essentially the same as the Academy regulations, then, as we have already held, it would pass constitutional muster. If, instead, the word "desires" were interpreted to extend the definition of homosexual to persons not likely to engage in homosexual conduct, a different question would be presented; but Steffan has not indicated, in his framing of the case, that he is affected by that possible (if far-fetched) definition.

The dissent nevertheless argues that "nothing Steffan could have said before the Performance Board would have been remotely relevant to his predicament." Dissent at 716–17. We simply do not understand how our colleagues can so conclude. Had Steffan responded "yes" to the question whether he was a homosexual but also said that he meant only that he entertained homosexual thoughts, it is not at all clear to us what the Board would have done. The Board might well have determined that under those circumstances it should enter a "further finding that the member is not a homosexual," as the Directives contemplate. Or, the Board might then have sought to determine the parameters of the term "desires." Does the term mean something close to an actual intent to engage in homosexual conduct or, as the original panel in this case concluded, mere "inclinations" and "fantasies." *Steffan v. Aspin,* 8 F.3d 57, 66 (D.C.Cir.1993), *vacated and rehearing en banc granted* (D.C.Cir. Jan. 7, 1994). We must bear in mind that

although Steffan has implicitly conceded that he harbors homosexual desires, he has never explained how *he* defines that term.

Steffan was, moreover, amply represented by counsel (*compare* dissent at 717). If he believed that he was obliged to answer the question affirmatively solely because of the "desires" portion of the DOD Directives, it surely would have occurred to his counsel that the appropriate predicate for a constitutional challenge would include an explanation of what Steffan meant—and did not mean—by his answer.

As the record stands, Steffan has made no effort either in the Academy proceeding, in his subsequent letter to the Secretary of the Navy, or even in his suit in federal court to demonstrate how the Directives' allegedly overbroad definition of homosexual was applied to him. Putting the proceedings before the Board aside, it seems to us that Steffan has no conceivable basis, once he came to federal court with a collateral challenge, for *not stating* in his allegations exactly how the "desires" portion of the Directives injured him. Steffan seeks to blur the distinction between an as-applied and a facial challenge; he wishes to attack the Directives at the point he believes they are weakest legally without shouldering the burden requisite to such an attack—a demonstration that the supposedly irrationally overbroad definition had a real impact on him. This he cannot do.

To be sure, as the dissent emphasizes, dissent at 717–18, this case has been before this court before. In *Steffan v. Cheney*, 920 F.2d 74 (D.C.Cir.1990) (per curiam), we reversed the district court's dismissal of the case as a sanction for Steffan's refusal to answer deposition questions about whether he had engaged in homosexual conduct during *or after* his tenure as a midshipman. Steffan asserted his Fifth Amendment privilege and also objected that the questions were not relevant. The district court disagreed on the theory that Steffan's conduct, even subsequent to dismissal, would be germane to the question of remedy—that is, whether, if he had been illegally dismissed, he could still be ordered commissioned. We

held that the government was obliged to defend the discharge based on the administrative record before the Board at the time of its action and disagreed with the district court as to its remedial rationale. *Id.* at 76.

We decidedly did not say that Steffan's conduct prior to his dismissal was categorically irrelevant to the case; we expressly envisioned the possibility that conduct-related issues might be "relevant" on some "other ground." *Id.* Neither we nor the district court even considered at that point whether Steffan had an obligation in making an as-applied challenge to indicate that his statement embracing homosexual status was not linked to homosexual conduct, or the intent to engage in that conduct.

The dissent's assertion that "We also specifically rejected the government's argument that because of a 'rebuttable presumption' or 'celibate homosexual exception' in the regulations, Steffan was presumptively caught by the conduct or intent prongs of the regulation until he demonstrated otherwise," dissent at 718, is simply not accurate, and therefore the dissent's contention that we have reversed the prior panel decision is incorrect. Our entire treatment of the question was contained in the following footnote:

> The Government now argues that Steffan's admission of homosexuality raised a "rebuttable regulatory presumption that he had a prediliction [sic] to commit, and had committed, homosexual acts." This argument, *not raised in the district court*, finds no support in the record.

*Id.* at 76 n. * (emphasis added). As we contemplated, the government, on remand, did present the argument in the district court, which is why the next time the case appeared before this court, *see Steffan v. Aspin*, 8 F.3d 57, 64–65 (D.C.Cir.1993), *vacated and reh'g en banc granted* (D.C.Cir. Jan 7, 1994), the panel treated the issue on the merits and did not assert that it was foreclosed, as the dissenters now argue, by the law of the case doctrine. Dissent at 718 & n. 25 (*citing Steffan v. Aspin*, 8 F.3d at 64–65).[19]

---

19. Our conclusion does not depend on the existence of a so-called "celibate homosexual exception." On this record, we cannot determine whether the government would have formulated

## 697

### B.

 Alternatively, we think Steffan lacks standing to bring his particular challenge to the DOD Directives. Steffan may well have Article III standing, which requires only injury in fact (his termination from the Academy) that is fairly traceable to the Directives (assuming, for purpose of this section of our opinion, that the Directives rather than the Academy regulations were the basis for his termination). But a litigant must still pass through the prudential standing barrier, and Steffan does not. Prudential standing is of course, like Article III standing, a jurisdictional concept. Normally we would focus on that issue first before considering whether Steffan brought a viable claim. But in this case the two issues are quite intertwined; it is only after a careful dissection of Steffan's claim that it also becomes apparent that he lacks standing to litigate the issue he wishes us to decide.[20]

 Absent certain limited exceptions—such as in the First Amendment context, *see, e.g., Gooding v. Wilson,* 405 U.S. 518, 520–22, 92 S.Ct. 1103, 1105–06, 31 L.Ed.2d 408 (1972), where some impediment to the assertion by a rightholder of his or her own rights exists, *see Powers v. Ohio,* 499 U.S. 400, 410–11, 111 S.Ct. 1364, 1370–71, 113 L.Ed.2d 411 (1991), or where litigants have been allowed to assert the rights of third parties in order to protect a threatened relationship, *see Wulff v. Singleton,* 428 U.S. 106, 112–16, 96 S.Ct. 2868, 2873–75, 49 L.Ed.2d 826 (1976); *Craig v. Boren,* 429 U.S. 190, 195, 97 S.Ct. 451, 455–56, 50 L.Ed.2d 397 (1976); *see also Fair Employment Council v. BMC Marketing Corp.,* 28 F.3d 1268, 1277–78 (1994)—prudential standing notions mandate that a plaintiff's suit seek to vindicate his own legal rights or interests, not those of some absent third party. *See Warth v. Seldin,* 422 U.S. 490, 499–500, 95 S.Ct. 2197, 2205–06, 45 L.Ed.2d 343 (1975); *Nordlinger v. Hahn,* —— U.S. ——, ——, 112 S.Ct. 2326, 2332, 120 L.Ed.2d 1 (1992). This requirement means that there must be a connection between the injury suffered and the legal right or theory asserted. Prudential standing, then, again like Article III standing, focuses in part on causation. But unlike Article III, which requires a plaintiff merely to show a connection between his injury and the governmental "action" he challenges, *see Valley Forge Christian College v. Americans United For Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982), prudential standing requires the existence of a further link between the injury and the legal right asserted by the plaintiff. For if the alleged *wrongfulness* of the injurious action challenged, that is, the asserted violation of a legal right, was not causally related to the injury suffered—if, in other words, it was not the illegal aspect of the action challenged that harmed the plaintiff—then the suit in question would not be one to vindicate that plaintiff's *own* rights. One cannot vindicate what has never been threatened.

The legal right or interest on which Steffan rests his claim for relief is a right against discharge (which he terms "punishment") on the basis of his thoughts or "desires"—what he sometimes calls his "status." That claim only vindicates his own rights or interests if Steffan's discharge was, as we have noted, due solely to his desires. If, on the other hand, Steffan had by his statement meant that he had actually engaged or intended to engage in homosexual conduct, so as to have qualified as a homosexual under the Directives *irrespective* of the "desires" clause, then his challenge to that clause would vindicate no cognizable interest of his.

In order for Steffan's claim for relief to be based on the assertion of his own right or interest, then, the legal wrong he ultimately

such a concept in applying the DOD Directives, or what it would mean. Although the government has used the term in its briefs, our opinion does not rely upon it, and we therefore need not reach Steffan's "due process" argument that he could not have known about that "exception." It is indisputable that the Directives provide that the Board could determine that a member was not a homosexual even if he stated that he was a homosexual, and it was surely open to anyone to force the government to elaborate upon the meaning of "desires."

**20.** Standing can be raised at any point in a case proceeding and, as a jurisdictional matter, may be raised, *sua sponte,* by the court.

alleges—the inclusion of the term "desires" in the Directives—must have led to his discharge. In turn, for Steffan's discharge to have been caused by the inclusion of the "desires" clause in the Directives, *each* of the following five facts would have to be true: Steffan did not engage or intend to engage in homosexual conduct; Steffan read the Directives (or learned about them) and determined that they defined the term "homosexual" to include one who "desires to engage in homosexual conduct"; Steffan understood "desires" to mean a mental state sufficiently removed from "intent" as to approach simple "thoughts" and thereby create a constitutional problem (Steffan, after all, conceded that if the verb "desires" was virtually synonymous with "intent" the Directives would be constitutional [21]); when Steffan answered "yes" to the question "are you a homosexual," he meant by that answer *only* that he had such a "desire" to engage in homosexual conduct; and, finally, the military defined "desires" to mean something similar to that understanding. It is evident that Steffan has failed adequately to allege the existence of *any* of them.

Taking the last point first, Steffan, as we have already explained, never obliged the Navy to give the term meaning by applying it in an adjudication. Instead, he asks us to assume a meaning, one that is sufficiently expansive to raise a constitutional issue. Perhaps, if the word "desires" had an obvious interpretation in this context Steffan's claim might be defensible, but as oral argument made clear, that is hardly so. The possible meanings stretch from a publicly expressed passion (which would seem to be practically indistinguishable from intent) to a fleeting private imagining. Steffan does not simply ask us to speculate as to the Navy's understanding, which would itself be inappropriate—he would have us provoke, rather than avoid, a possibly difficult constitutional issue.

Turning to Steffan—his experiences, his knowledge, and his state of mind when he answered the fateful question affirmatively—the crucial gap in his allegations is the absence of any claim that as of the time he answered he had not engaged or intended to engage in homosexual conduct. If he had, the military would have been entitled even under his constitutional theory to terminate him from the Academy. For under such circumstances, his desires would not be independent of conduct and therefore of no particular relevance to the military—or to him—when he answered the question. Steffan's causal argument implicitly is that *he*, not the Board, interpreted the Directives to oblige him to answer the question "Are you a homosexual?" affirmatively, but that claim is not plausible or logical unless at the time Steffan's *only* reason for answering yes was his desires. Understandably, Steffan has never suggested that he meant only that he harbored homosexual desires and that by desires he referred to something so removed from an intention as to constitute a pure thought. For that matter, he does not claim that he had even heard of the definition of homosexual in the DOD Directives. In sum, Steffan has not even attempted to trace his injury to the legal infirmity in the regulations he would have us address.

Steffan would have us rule on a delicate question of law in what is, in truth, a hypothetical case. For all the record shows, and for all the pleadings reveal, Steffan declared himself to be a "homosexual" because he in fact engaged in homosexual conduct. As applied to such facts, the regulations would be, by Steffan's own admission, constitutional. Were the military to discharge someone on the basis of a statement that the member was "homosexual," and were that member to indicate that he had neither engaged nor intended to engage in homosexual conduct, that person would be an appropriate plaintiff to bring a case focusing on the constitutionality of the "desires to engage in" clause in the Directives. This is not such a case.[22]

\* \* \*

---

**21.** In fairness to Steffan, his counsel vigorously disputed that the term "desires" *could* have such a meaning. *But see Meinhold,* 34 F.3d at 1479 (interpreting "desires" as used in the Directives to have essentially the same meaning as intent).

**22.** The dissenters disagree with our conclusions on the constitutionality of the regulations and insist that Steffan was wrongly discharged. They presumably also dissent from the implicit denial of relief. And yet they do not decide the question

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered.*

BUCKLEY, Circuit Judge, with whom Circuit Judge RANDOLPH joins, *concurring in part*:

I agree with the court's analysis in every respect but one. I cannot concur in its holding, in part III.B., that Steffan lacked standing "to bring his particular challenge to the DOD Directives."

In his complaint, Steffan acknowledges what he describes as his "homosexual orientation," notes that there was "no allegation [in the proceedings before the Brigade Performance Board] that [he] had committed any homosexual acts or conduct," and alleges that his forced separation from the Naval Academy was "predicated solely on [his] sexual orientation" and on laws and regulations that he considers unconstitutional because, among other things, they "punish[ ] his thoughts, speech and status, as opposed to his conduct." Complaint, ¶¶ 17, 22, 30, & 34. Fairly construed, these allegations amount to a claim that Steffan suffered an injury directly caused by allegedly unconstitutional regulations.

It seems to me that this is sufficient to open the door to the courthouse. Once inside, of course, it was incumbent on Steffan to offer evidence to support his contention that he was required to resign based on his thoughts (or "desires") rather than on the inferences as to his conduct and intentions that the Board was entitled to draw from the statement, "I am a homosexual." To say that he failed to prove his contention is surely not to say that he lacked standing to make the attempt.

RANDOLPH, Circuit Judge, concurring in part:

I join all of the court's opinion, except part IIIB, which holds that Steffan did not have standing to challenge the constitutionality of the Department of Defense regulations.

Steffan has never pinpointed where on the continuum between homosexual conduct and mere homosexual thoughts he placed himself at the time of his "constructive" discharge. He treats the matter as irrelevant. Our opinion in *Steffan v. Cheney,* 920 F.2d 74 (D.C.Cir.1990) (per curiam), basically agreed. The legal issue posed by the case, both then and now, is whether the military relied on unconstitutional grounds in threatening to force Steffan out of the Naval Academy. 920 F.2d at 76. Obviously, one cannot begin to decide that issue unless one first identifies the military's grounds. Here is where Steffan's case runs into difficulty. The problem for Steffan is not lack of standing. It is that he failed to substantiate an essential portion of his case—namely, the truth of his claim that the military constructively discharged him *solely* because of his "homosexual orientation." Two points strike me as important in this regard.

First, Steffan's allegation is aimed at what the military officials had in their collective minds, not what Steffan had in his. Given the posture of the case, the majority opinion's list of "facts that would have to be true" for Steffan to have standing—whether Steffan read the regulations, whether he had some particular definition in mind when he said he was a homosexual, whether (unknown to officials at the Academy) he had engaged in homosexual conduct—seem to me beside the point. It is the military's grounds for decision that are decisive. "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.,* 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943); *White v. Secretary of the Army,* 878 F.2d 501, 503 (D.C.Cir. 1989).

The second point is more significant. Steffan has not established, and in my view cannot establish, that the military constructively discharged him only because of what he calls

on which the government sought rehearing, *i.e.,* whether separation-of-powers principles permit the court to order relief in such a case—a question which, despite their characterization, is hardly "hypothetical" if one concludes that Steffan was unconstitutionally dismissed. *See* dissent at 720 n. 27.

"homosexual orientation." Of course one may safely assume that individuals who engage in homosexual conduct have such an orientation. But in attributing reasons to the military, Steffan excludes those individuals. He envisages those men, and only those men, who are sexually attracted to other men, who have not engaged in homosexual conduct, and who predict they will never act on their sexual urges during their years in the military, on duty or off. The problem for Steffan is that the record fails to disclose that the military acted on the basis he proposes. The relevant Department of Defense and Naval Academy regulations do not even mention "homosexual orientation." To be sure, the psychological report submitted to the Brigade Performance Board said that Steffan "admitted to homosexuality" and that this "orientation pre-dates his tenure at the Naval Academy." The Board thereupon heard Steffan profess to being a homosexual and, after deliberating privately, rendered its decision that Steffan should be discharged "by reason of homosexuality." There is but one conclusion to be gleaned from this: the Board found that Steffan had violated the Naval Academy regulation, which states that "homosexuality" includes "statements by the member that he or she is a homosexual . . . ." United States Naval Academy Regulation, COMDTMIDN Instruction 1610.6F Ch–2.15.3.c (July 16, 1987). Steffan's claim that the military meant what he supposes is a claim he has not proven, and it is one he cannot at this stage establish. He must take the record as it was made at the time. So must we. When the Academy proceedings terminated with the Board's recommended decision and Steffan's resignation, the record closed. Thereafter, the mental processes of the decisionmakers could not be probed. *United States v. Morgan,* 313 U.S. 409, 421–22, 61 S.Ct. 999, 1004–05, 85 L.Ed. 1429 (1941); *National Nutritional Foods Ass'n v. FDA,* 491 F.2d 1141 (2d Cir.1974) (Friendly, J.). As a result, the only question before us with respect to both sets of regulations is whether a member's statement that he is a homosexual supplies the military with a rational basis for discharging him. On that score, I fully agree with the reasoning of the majority opinion that it does. Insofar as Steffan claims that the military acted against him pursuant to a policy of discharging those he defines as having only a "homosexual orientation," he loses because he has not made out an essential element of his claim. Steffan had standing to try. He simply failed in the attempt. Since the majority opinion credits Steffan with standing in regard to the Naval Academy regulations, and since what I have written conforms to my reading of the majority's resolution of the DOD regulations, I concur with all but part IIIB of the majority's opinion.

GINSBURG, Circuit Judge, concurring in part, dissenting in part and concurring in the judgment:

The Supreme Court has held time and again that "[t]he judicial power of the United States defined by Art. III is not an unconditional authority to determine the constitutionality of legislative or executive acts." *Valley Forge Christian College v. Americans United For Separation of Church and State,* 454 U.S. 464, 471, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). Hence, a federal court must decide the controversy presented to it and only that controversy. *Cf. Broadrick v. Oklahoma,* 413 U.S. 601, 610–11, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 ("[U]nder our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws").

As this case comes to us on appeal, Joseph Steffan challenges only the constitutionality of the Department of Defense Directives promulgated in 1991. Steffan clearly states in his brief that his complaint is that he "was discharged from the [Naval] Academy pursuant to servicewide regulations promulgated in 1981 as part of Department of Defense Directives 1332.14 and 1332.20." Because Steffan does not challenge the Academy's own separate regulation concerning homosexuality, I do not believe that the court should address that regulation, much less render a constitutional decision concerning it.

The constitutionality of the Academy's regulation is an important question that ought not be addressed until a litigant who actually claims to have been injured by its application comes before the court. As he has framed

his arguments before this court, Steffan is not such a litigant. Because the court nonetheless reaches out to decide that question, it renders what is, in essence, an advisory opinion. I therefore dissent from Part II of the court's opinion.

Insofar as Steffan has brought before the court his attack upon the constitutionality of the DOD directives, I agree with Judge Silberman that Steffan does not have standing to sue and that he may not bring a facial challenge to those regulations. I therefore join in Part III.B of Judge Silberman's opinion and concur in the judgment of the court.

Dissenting opinion filed by Circuit Judge WALD, with whom Chief Judge EDWARDS and Circuit Judge ROGERS join.

WALD, Circuit Judge, dissenting:

From the beginning, the central issue presented by Steffan's case has always been whether the military may constitutionally exclude from membership in the services individuals who admit to homosexual *orientation,* without any evidence of homosexual conduct or intent to engage in such conduct. Today's majority reformulates Steffan's appeal to avoid this critical issue. Through ingenious but totally unjustified uses of presumptions and inferences, the court seeks to transform Steffan's case into one concerning homosexual conduct—when in fact the Navy has never even alleged that Steffan engaged or intended to engage in such conduct. *See* Majority opinion ("Maj. op.") at 695.

The linchpin of the court's transformation strategy is its assertion that "a statement that one is a homosexual" may be "used by the Navy as a proxy for homosexual conduct—past, present, or future." Maj. op. at 688. We disagree in the most fundamental way with that claim, and believe that in the military context, where homosexual conduct results in automatic discharge or imposition of criminal sanctions, it is inherently unreasonable to equate an admission of homosexual identity with commission of or intent to engage in homosexual conduct. The *in banc* court's attempt to recast the case to avoid the issue that the parties, the trial court, and the original panel opinion have identified as at the core of this litigation must ultimately fail. The critical issue posed in the starkest fashion by Steffan's case is whether a member of the armed forces may be discharged on the sole basis of an admission of his homosexual orientation. We believe that he may not and we therefore dissent.

## I. BACKGROUND

This case has a long and complicated history. The majority's summary of that history is incomplete and in important respects misleading. A fair appraisal of the competing constitutional positions demands a more thorough exposition of the underlying events and earlier stages of this litigation.

In 1983, Joseph Steffan enrolled in the United States Naval Academy. During his four years there, his superiors variously praised him as "gifted," "professional," an "outstanding performer" who "exhibited excellent leadership," and an "asset to the Academy." None questioned that he would "undoubtedly make an outstanding naval officer."

In February 1987, less than three months before Steffan was scheduled to graduate from the Academy, the Naval Intelligence Service ("NIS") received a report alleging that Steffan had told two fellow students that he was homosexual. The NIS began an inquiry that continued until June 16, 1987. The final report from the NIS investigation found no evidence of homosexual conduct on the part of Steffan.[1]

In mid-March, Steffan learned of the NIS investigation from another midshipman. He

---

1. In light of this investigation, we find it curious that the majority would define the class of persons at issue in this case not as those "who say they are gay but have not acted in accordance with their propensity in the past," as the Ninth Circuit recently did in *Meinhold v. United States Dep't of Defense,* 34 F.3d 1469 (9th Cir.1994), but rather as "persons who say they are gay but as to whom the military has no additional evidence as to their conduct." Maj. op. at 687 n. 7. To suggest that the military had "no [] evidence" regarding Mr. Steffan's conduct following a four-month investigation is surely incorrect—the plain truth is that the evidence they did find showed no homosexual conduct.

asked the Chief of Chaplains at the Academy, Captain Byron Holderby, to intercede on his behalf with the Commandant of Midshipmen,[2] Captain H.W. Habermeyer, in the hope that the Chaplain's aid could "assure his graduation." Captain Holderby's efforts proved unavailing; accordingly, Captain Habermeyer "advised [him] to advise Midshipman Steffan to seek legal counsel regarding this matter."

Several days later, Steffan himself approached Captain Habermeyer with a special request to see the Superintendent. Steffan explained that he wished to tell the Superintendent personally of his desire to graduate with his class in June. Captain Habermeyer asked Steffan, "Are you willing to state at this time that you are a homosexual?" Steffan responded, "Yes, sir." Captain Habermeyer informed Steffan that he would not recommend approval of his request, and that he "seriously doubted whether [the Superintendent] would permit [Steffan's] completion of his course of study to receive his diploma."

The following day, March 24, Captain Habermeyer convened a Brigade Military Performance Board to review Steffan's situation.[3] The hearing began with introductory remarks by Captain Konetzi, the presiding officer, including a description of Steffan's performance at the Academy as "outstanding." He then asked Steffan, "I'd like your word, are you a homosexual?" Steffan responded "Yes, sir." Captain Konetzi continued, "Do you have anything else to add at this point?" Steffan replied, "No, sir." Captain Konetzi thereupon concluded the hearing. The Board voted to forward Steffan's case to the Commandant with the recommendation that Steffan be separated from the Academy.

On March 26, the Commandant referred Steffan's case to the Academic Board, with the recommendation that "Midshipman Steffan be separated from the Naval Academy due to insufficient aptitude for commissioned service." On April 1, the Board convened. It urged Steffan to "accept a qualified resignation in lieu of discharge." Steffan gave a brief prepared statement in which he asked that he be allowed to graduate. The Board then voted unanimously to recommend discharge to the Superintendent.

That same day, the Superintendent advised Steffan that he intended to recommend Steffan's discharge to the Secretary of the Navy. The Superintendent, however, exercised his authority to permit Steffan the option of submitting a qualified resignation; he stated that if Steffan did so, he would forego submitting a recommendation of discharge.

Also on April 1, Steffan met with the Academy Performance Officer, Major Funk, whose duty it was to counsel midshipmen faced with the choice between qualified resignation and discharge. Major Funk stated that discharge would require noting Steffan's admission of homosexuality on his record. Major Funk expressed his opinion that Steffan's job prospects would suffer from such a notation. He repeated the Academic Board's urging that Steffan resign rather than wait to be discharged.

---

2. The Commandant of Midshipmen is the officer second-in-command at the Academy, responsible only to the Superintendent. The Superintendent, in turn, answers to the Chief of Naval Operations, and is subject to the policies of the Secretary of the Navy.

3. The Naval Academy's Military Performance System provides for several levels of review before a midshipman may be separated from the Academy. Steffan's case began at the Brigade Performance Board level. When, as in Steffan's case, the Brigade Performance Board finds in favor of separation, the Board's authority is limited to recommending the midshipman's separation to the Commandant of Midshipmen.

If the Commandant finds in favor of separation, he makes that recommendation to the Naval Academy Academic Review Board. That Board, if it also believes separation necessary, refers the case to the Superintendent of the Academy.

Upon receiving a recommendation of separation, the Superintendent must forward it to the Secretary of the Navy. The Superintendent may also, however, elect to give the midshipman the option of qualified resignation rather than outright discharge. If the midshipman receives and elects to exercise this option, by so doing he forfeits the right to show cause to the Secretary why the Superintendent's recommendation for separation should not be approved. The Secretary of the Navy makes the final decision whether to approve the separation—whether discharge or resignation. Once the Secretary has reached a decision, the Naval Academy regulations do not provide for further review.

Still on April 1, approximately six weeks before graduation and after nearly four years of outstanding performance, Steffan agreed to submit his qualified resignation. He signed a statement of understanding reiterating that he would be discharged if he refused to resign, and warning that by submitting a qualified resignation, Steffan would "forfeit his right to show cause to higher authority why he should not be disenrolled from the Naval Academy." On May 28, 1987, the Secretary of the Navy accepted Steffan's resignation.

On December 9, 1988, Steffan wrote to the Secretary of the Navy, requesting permission to withdraw his resignation and graduate from the Academy. The Secretary referred the matter to the Superintendent of the Academy, who "strongly" recommended denying Steffan's request. He stated that because "Mr. Steffan admitted to being a homosexual" he "had insufficient aptitude to be a commissioned officer." In accordance with this recommendation, the Secretary disapproved Steffan's request.

Steffan filed this action on December 29, 1988. He requested a ruling that "the regulations pursuant to which the Naval Academy acted are unconstitutional ..." on the ground, inter alia, that the government had denied him equal protection under the Due Process Clause of the Fifth Amendment by forcing him to resign after a determination of "'insufficient aptitude' predicated solely on [his] sexual orientation." The complaint did not specify which regulations were at issue. Indeed, several colloquies between this court and counsel for both Steffan and the Secretary during oral argument in banc demonstrate that neither Steffan nor the government were certain precisely which regula-

tions authorized the Navy's "processing" of Steffan. The majority correctly notes that "at various times different bodies within the military hierarchy relied on either [the Naval Academy's own regulations] or [a Directive promulgated by the Department of Defense], or both." Maj. op. at 684.

Steffan's legal attack precipitated a flurry of opinions in the district court and in this court. In the first round, Steffan v. Cheney, 733 F.Supp. 115 (D.D.C.1989), the Secretary argued for dismissal on two threshold procedural grounds. First, the government claimed that Steffan lacked standing due to the "voluntary" nature of his resignation. The district court disagreed, holding that the purported "voluntariness" was no bar to jurisdiction. Steffan's factual allegations established injury-in-fact (separation from the Academy) fairly traceable to defendants' action (adoption and enforcement of regulations barring self-declared homosexuals from the Academy) and redressable by the court (through reinstatement and a declaratory judgment), thus clearly conferring Article III standing. Id. at 118–19.

The government also argued that Steffan had failed to exhaust his administrative remedies. It claimed that if Steffan's resignation were truly involuntary, the Board for Correction of Naval Records ("BCNR") could afford him "complete relief by reinstating him back into the Academy."[4] Id. at 119. The court rejected this argument on two grounds. First, the BCNR was not empowered to reinstate Steffan, but only to forward the matter to the Secretary of the Navy; yet the Secretary of the Navy had already once considered and rejected Steffan's request to withdraw his resignation. Appeal to the BCNR thus

4. The government at no time put forth the majority's novel argument that Steffan had failed to exhaust his administrative remedies because the BCNR or some other agency could have granted relief by finding that some individuals who state "I am a homosexual" do not fit the Navy's definition of "homosexual." Maj. op. at 695. To the contrary, the government made clear that if Steffan were reinstated to the Academy, he would then "undoubtedly" be discharged. They wrote: "Officers who admit that they fit within the Navy's regulatory definition of homosexuality are inevitably discharged.... The regulation requires discharge in all cases." Steffan, 733

F.Supp. 115, 120 (D.D.C.1989) (citing Defendants' Reply Brief at 21 n. 8).

The Ninth Circuit, in Meinhold v. U.S. Dep't of Defense, 34 F.3d 1469 (9th Cir.1994), recently rejected the argument that "further review could have made a difference as the parties differed over the regulatory definition of 'homosexual.'" The court held that further administrative review would have been futile because there was "nothing in the record [to] suggest[] that a disposition by the BCNR could have differed [from the disposition of the discharge board]." Id. at 1474. The same is, of course, true in this case.

could not have afforded Steffan "meaningful relief." In addition, even if Steffan were permitted to withdraw his resignation, he would thereupon be "inevitably discharged" because he had "admit[ted] that [he] fit within the Navy's definition of homosexuality." *Id.* at 120.

A second district court opinion, *Steffan v. Cheney*, 733 F.Supp. 121 (D.D.C.1989), addressed the government's Motion for Rule 37 Sanctions, based upon Steffan's refusal, on the grounds of irrelevance and Fifth Amendment privilege, to respond to deposition questions concerning whether he had engaged in homosexual acts. The district court acknowledged that Steffan was separated from the Academy based on his admissions rather than on any evidence of misconduct, but found inquiry into possible homosexual conduct "highly relevant" to Steffan's qualification for reinstatement. *Id.* at 124–27.

In a *per curiam* opinion, this court (JJ. Wald, Ginsburg and Randolph) reversed and remanded. *Steffan v. Cheney*, 920 F.2d 74 (D.C.Cir.1990). We held that because "judicial review of an administrative record is confined to '[t]he grounds ... upon which the record discloses that [the] action was based,'" *id.* at 76, *citing SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943), and the record in Steffan's case reflected an "administrative determination that he [was] unfit for continued service because he stated that he is a homosexual," the district court had erred in requiring Steffan to answer conduct-related questions. We also rejected the government's argument that homosexual conduct essentially *had* to have been involved in the administrative determination because "Steffan's admission of homosexuality raised a 'rebuttable regulatory presumption that he had a predilection [sic] to commit, and had committed, homosexual acts.'" *Id.* at 76 n. *. This claim, the court wrote, was "not raised in the district court [and] finds no support in the record." *Id.*

On remand to the district court, the government and Steffan cross-filed for summary judgment. The district court, in *Steffan v. Cheney*, 780 F.Supp. 1, 4 (D.D.C.1991), *rev'd*, 8 F.3d 57 (D.C.Cir.1993), *vacated and rehearing in banc granted*, (D.C.Cir. Jan. 7, 1994),

granted the government's motion and upheld "the regulations in question," but did not specify which regulations were "in question." Today's majority correctly notes that "[m]idshipmen enrolled in the Naval Academy are subject to at least two sets of regulations relevant to homosexuality: the Naval Academy's own regulations ["Navy regulations"] and the Directives of the Department of Defense ["DOD Directive"] applicable to the armed forces." Maj. op. at 682. And the district court wrote that "[t]he plaintiff is suing for ... a declaration that the Department of Defense Directives 1332.14 and 1332.30, and all other regulations applied to the plaintiff prohibiting those with a homosexual orientation from serving in the Navy or attending the Naval Academy, are violations of the equal protection component of the fifth amendment to the Constitution." *Steffan*, 780 F.Supp. at 2. Therefore, by granting the Secretary's motion for summary judgment, the district court appears to have ruled that both sets of regulations were constitutionally valid.

The district court was more precise, however, concerning the focus of the case. Alluding to our earlier holding that Steffan's conduct was irrelevant to this case, *Steffan*, 920 F.2d at 76 (D.C.Cir.1990), the court stated at the outset that "this is primarily a case about the plaintiff's status as a homosexual." *Steffan*, 780 F.Supp. at 5. Nevertheless, it held, the "regulations in question are not violative of [ ] equal protection" because (1) homosexuals are not a suspect class, so regulations discriminating on the basis of sexual orientation are subject only to rational basis review, *id.* at 5–10, and (2) the regulations bear a rational relation to the legitimate government goals of "maintenance of discipline, morale, good order, a respected system of rank and command, ... morality and respect for [ ] privacy interests," *id.* at 16, and to the goal (not raised by the government) of preventing the spread of AIDS in the armed forces. *Id.* at 13–16. Essentially, the court reasoned that because Steffan's statement of orientation indicated he might "one day" engage in misconduct, all of the justifications that the Navy could offer in a case involving

conduct "have equal application to this non-conduct case." *Id.* at 12.

Steffan appealed. His brief to the panel stated the principal issue to be "[w]hether the military regulations that exclude persons from the armed services solely on the basis of their status as homosexuals . . . violate the constitutional guarantee of equal protection of the laws." Appellant's Brief at 1, *Steffan v. Aspin*, 8 F.3d 57 (D.C.Cir.1993). He included both the Navy and DOD regulations in his addendum of challenged regulations and discussed both in his brief.[5] The government's brief presented the question as "[w]hether the military's 'old policy' on service by homosexuals . . . violates equal protection." Appellees' Brief at 1. The government's brief expressly discusses only the DOD Directive; it nowhere mentions the Navy regulations.

The panel unanimously reversed the district court's judgment, and ordered Steffan reinstated in military service, graduated from the Academy, and commissioned in the Navy. *Steffan v. Aspin*, 8 F.3d 57, 70 (D.C.Cir.1993), *vacated and rehearing in banc granted* (D.C.Cir. Jan. 7, 1994). Following the lead of the district court and the parties, the panel did not consider the Navy regulations and DOD directive to pose separate constitutional questions, and specifically addressed itself only to the DOD Directive.

The panel emphasized that because the "district court [had] acknowledged that Steffan was discharged solely because of his status as a homosexual," the critical issue in the case concerned the constitutionality of excluding from the services a "class [of individuals] . . . defined by homosexual *orientation*, not conduct." *Id.* at 63. The panel declined to consider whether homosexual orientation constitutes a suspect classification for purposes of equal protection analysis; instead it rejected the district court's reasoning that the government may rationally infer from a serviceman's admission of "homosexuality"—defined by the Directives to include mere "desires"—a "propensity" to engage in repeated homosexual conduct so as to justify separation.

The government determined to forego appeal of the panel's decision on the merits. Instead, the government asked this Court to consider *in banc* whether that portion of the panel's remedial order that required Steffan to be commissioned as an officer, *see Steffan*, 8 F.3d at 70, violated separation of powers principles. This court voted *sua sponte* to rehear Steffan's entire case, including the merits, *in banc*. This extraordinary measure brought this case back before us for a fourth time.[6]

## II. ANALYSIS

### A. The Importance of Steffan's Concession

The majority declares that Steffan's concession that "the military may discharge those who engage in *homosexual conduct* whether on or off duty"[7] "frames the dispute." Maj. op. at 684 (emphasis added). We agree, but Steffan's concessions should be understood for what they are—concessions on issues not properly presented by this case, and that certainly do not warrant the majority's intimation that he was *obliged* to make them.[8]

---

5. For example, Steffan's Statement of the Case specifically mentioned only the "Navy's regulations," while his Argument more frequently referred to "the servicewide regulations promulgated in 1981 as part of Department of Defense Directives 1332.14 and 1332.30. . . ."

6. We have discussed only three; on the remaining occasion, not relevant to this appeal, we upheld in an unpublished opinion the district judge's refusal to recuse himself.

7. Counsel for Mr. Steffan also conceded "for today" that the military could constitutionally discharge individuals who "haven't yet engaged in homosexual conduct but [ ] intend to."

8. The majority writes:

> Steffan concedes that the military may constitutionally terminate service of all those who engage in homosexual conduct—wherever it occurs and at whatever time the conduct takes place. *See Dronenburg v. Zech*, 741 F.2d 1388, 1398 (D.C.Cir.1984) . . .; *Beller v. Middendorf*, 632 F.2d 788, 812 (9th Cir.1980). . . .

*Maj. op.* at 685 & n. 4. Neither case, however, suggests that the military may constitutionally discharge members who engage in *any* "homosexual conduct" at *any* time, as the regulations under review in this case purport to do. *See infra* at 685. The issue in *Dronenburg* was whether the Navy was constitutionally *entitled to* discharge a "27–year–old petty officer [who] had

Like the district court and earlier panels of this court, Steffan believed that the question whether homosexual conduct may be proscribed in the armed services had no bearing on his appeal. Indeed, from the time of this court's decision in *Steffan v. Cheney,* 920 F.2d 74 (D.C.Cir.1990), until today, everyone in this litigation reasonably believed that it concerned only the constitutionality of excluding from the services a "class [of individuals] ... defined by homosexual *orientation,* not conduct." *Steffan,* 8 F.3d at 10. In that context, Steffan's concession at argument that "homosexual conduct" (of all varieties and in all circumstances) may be proscribed in the services must be viewed simply as an attempt to avoid argument about issues irrelevant to the appeal, as he and all other participants had pursued it up to that point, and not an authoritative statement of constitutional law. It is only in light of the majority's transformation of Steffan's case to one involving homosexual conduct that Steffan's concession assumes the critical importance that it has today.

### B. *The Issue Presented by this Case: Discharge for Orientation*

The majority disposes of Steffan's appeal by transforming his unadorned admission of "homosexuality" from a statement of homosexual *orientation* into a declaration of past or intended homosexual *conduct,* thus avoiding the difficult question this case actually presents: whether an individual may be constitutionally discharged from the military on the sole basis of an admission of homosexual orientation. This alchemy is not, of course, an original idea—the government has argued from the outset that an admission of homosexuality both raises a "presumption" of *past* homosexual conduct and indicates a "propensity" to engage in *future* homosexual conduct. The policy of excluding from the ser-

vices all who profess homosexual orientation is thus—according to the government—just a way of regulating conduct.

Today's majority, in contrast to the Ninth Circuit's recent decision in *Meinhold v. U.S. Dep't of Defense,* 34 F.3d 1469 (9th Cir. 1994),[9] embraces the government's position. Its only change is a linguistic one; the government's "presumption" of past conduct now becomes a "rational inference" of past conduct. But whether the Navy predicts *future* homosexual conduct from an admission of "homosexuality," or "infers" *past* homosexual conduct from the same statement, its action is still impermissible absent evidence corroborating such conduct or intent. Because the Navy may not rationally draw either inference, we conclude that Steffan was unconstitutionally discharged solely for his homosexual orientation.

### C. *Both Sets of Regulations Present the Same Issue*

We begin our analysis by emphasizing that although Steffan was "processed" under two sets of regulations—the Department of Defense Directives and the Naval Academy's own regulations—both present the same constitutional issue. Indeed, although the court's new emphasis on the Navy regulations and the bifurcated structure of its opinion might suggest otherwise, the crux of its argument is the same as to both sets of regulations. It is a "Heads, we win, Tails, you lose" proposition for Steffan, but ultimately a frolic and detour in terms of constitutional analysis.

The relevant portions of the Department of Defense Directive in effect at the time of Steffan's discharge read:

H. *Homosexuality*

1. *Basis*

a. Homosexuality is incompatible with military service. The presence in the mili-

---

[had] repeated sexual relations with a 19–year-old seaman recruit" "in a barracks on the Navy base." 741 F.2d at 1389, 1398. *Beller* involved the discharges of two servicemembers who admitted repeatedly engaging in homosexual conduct while in service, and one who refused to terminate an active homosexual relationship with a fellow servicemember. 632 F.2d at 792–95.

**9.** *Meinhold,* like this case, presented the question whether the services could constitutionally dis-

charge a member for acknowledging his homosexuality. In an opinion by Judge Rymer, the court construed the DOD Directive so as not to require discharge for a mere admission of homosexuality, thus avoiding the "serious constitutional problem[ ]" that would otherwise arise. *Id.* at 1476. The government has not sought *in banc* review in the *Meinhold* case.

tary environment of persons who engage in homosexual conduct or who, by their statements, demonstrate a propensity to engage in homosexual conduct, seriously impairs the accomplishment of the military mission. The presence of such members adversely affects the ability of the Military Services to maintain discipline, good order, and morale; to foster mutual trust among servicemembers; to ensure the integrity of the system of rank and command; to facilitate assignment and worldwide deployment of servicemembers who frequently must live and work under close conditions affording minimal privacy; to recruit and maintain members of the Military Services; to maintain the public acceptability of military service; and to prevent breaches of security.

b. As used in this section:

(1) Homosexual means a person, regardless of sex, who engages in, desires to engage in, or intends to engage in homosexual acts;

. . . .

(3) A homosexual act means bodily contact, actively undertaken or passively permitted, between members of the same sex for the purpose of satisfying sexual desires.

c. The basis for separation may include preservice, prior service, or current service conduct or statements. A member shall be separated under this section if one or more of the following approved findings is made:

. . . .

(2) The member has stated that he or she is a homosexual or bisexual unless there is a further finding that the member is not a homosexual or bisexual.

DOD Directives 1332.14 and 1332.30, 32 C.F.R. Part 41, App. A (1991).

The Navy regulations provide that midshipmen who "possess certain traits which are undesirable in commissioned officers" "may be processed for separation in accordance with this instruction." United States Naval Academy Regulation, COMDTMIDN Instruction 1610.6f Ch–2.15.1 (July 16, 1987). They go on to list a number of "problems . . . sufficient in and of themselves to warrant separation from the Naval Academy." *Id.* at Ch–2.15.3. Among these "problems" is:

c. Homosexuality. The basis for separation may include previous, prior service or current service conduct or statements. Homosexuality includes the member engaging in, attempting to engage in or soliciting another to engage in a homosexual act or acts. It also includes statements by the member that he or she is homosexual or bisexual, or the member marrying or attempting to marry a person known to be of the same biological sex.

*Id.* at Ch–2.15.3.c. The Navy regulations contain no further definition of "homosexual."

The court devotes the bulk of its opinion to the Navy regulations. The majority offers two different theories by which to equate Steffan's bare-boned statement of "homosexuality" with past or intended homosexual conduct. First, it says the Navy could properly have concluded from Steffan's statement that he was "likely" to engage in homosexual conduct in the future. Maj. op. at 685–86.[10] Second, the Navy could have taken his statement as an admission that Steffan had already engaged in past homosexual conduct. The nub of the majority's argument appears to be that when Steffan admitted his "homosexuality," he was actually "saying" any one of three things: (1) "I have already engaged in homosexual conduct"; (2) "I intend to engage in homosexual conduct"; or (3) "I desire to engage in homosexual conduct, but I do not engage or intend to engage in such conduct—I am simply homosexual by orientation."[11] Given this trinity of possible

10. This, of course, is the Navy's "propensity" argument, familiar from the earlier stages of this litigation. The court, however, now goes a step further, and suggests that the connection between homosexual orientation and conduct is far closer than mere "propensity"; there is actually no distinction between the two. *See* Maj. op. at 689–90.

11. These three meanings of "homosexual" appear explicitly in the DOD Directive, which states in part: "Homosexual means a person, regardless of sex, who engages in, desires to engage in,

meanings to Steffan's declaration of homosexuality, the argument continues, the military was entitled to infer that Steffan meant the first or second, but not the third. *See id.*

The court's disposition of Steffan's challenge to the DOD Directive is basically the same. First, the court contends that Steffan's "as-applied" challenge to the regulations fails because the Navy was entitled to infer "conduct" or "intent" from his admission of "homosexuality"; he therefore has not shown affirmatively that the "desires" prong of the regulation—the prong Steffan claims is unconstitutional "as applied"—was ever actually "applied" to him. Maj. op. at 693–96. Second, Steffan lacks "prudential standing" because if the Navy discharged him on the basis of "conduct" or "intent," inferred from his statement, then he was not harmed by the "desires" (or "orientation") portion of the regulation.[12] See Maj. op. at 698–99. Therefore, although the court addresses the two sets of regulations separately, both analyses present the same issue: whether the Navy could constitutionally discharge Steffan based solely on an *inference* of homosexual conduct—past or future—from his admission of homosexual orientation, without corroborating evidence of conduct or intent.

## D. *Rationality Review*

A government action that burdens individuals unequally but does not implicate a fundamental right or burden a "suspect" or "quasi-suspect" class is subject to "rational-basis" or "rationality" review. Rationality review requires, "at the minimum," that legislative classifications must be "rationally related to legitimate governmental objectives." *See, e.g., Schweiker v. Wilson,* 450 U.S. 221, 230, 101 S.Ct. 1074, 1081, 67 L.Ed.2d 186 (1981); *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982) (Under rationality review, "[t]he Equal Protection Clause directs that 'all persons similarly

circumstanced [must] be treated alike.'") (citation omitted). Rationality review also compels that the challenged legislation "find some footing in the realities of the subject addressed by the legislation." *Heller v. Doe,* — U.S. ——, ——, 113 S.Ct. 2637, 2643, 125 L.Ed.2d 257 (1993).

Thus certain kinds of motivations or justifications for discriminatory government behavior have been found categorically "irrational." For example, government actions depriving individuals of the equal protection of the laws on the sole basis of invidious prejudice or unreasoned antipathy can never be deemed "rational." *See City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 446–48, 105 S.Ct. 3249, 3257–59, 87 L.Ed.2d 313 (1985), *citing United States Dep't of Agriculture v. Moreno,* 413 U.S. 528, 533–35, 93 S.Ct. 2821, 2826, 37 L.Ed.2d 782 (1973) (holding a "bare ... desire to harm a politically unpopular group" insufficient to justify a statutory scheme). Similarly, government actions reflecting adherence to naked stereotypes cannot be "rational." *See Stanton v. Stanton,* 421 U.S. 7, 13–15, 95 S.Ct. 1373, 1377–78, 43 L.Ed.2d 688 (1975) ("role-typing" and "old notions" could not provide rational basis for a state statute specifying for males a greater age of majority than for females); *Reed v. Reed,* 404 U.S. 71, 75–76, 92 S.Ct. 251, 253–254, 30 L.Ed.2d 225 (1971) (mandatory statutory preference for men over women in the appointment of estate administrators failed rational-basis test).

The limited role that the courts continue to exercise under rationality review thus remains a significant bulwark against unreasonable and illegitimate classifications. When government action deprives individuals of the equal protection of the laws for arbitrary reasons, or for reasons founded solely upon irrational and invidious prejudices, a court must declare the action unconstitutional under rational-basis review. *Cleburne,* 473 U.S. at 450, 105 S.Ct. at 3259–60. Otherwise,

or intends to engage in homosexual acts." DOD Directives 1332.14 and 1332.30, 32 C.F.R. Part 41, Appendix A.

12. This curious "prudential standing" argument does not even convince a majority of the *in banc* court. As the concurrences of Judges Buckley and Randolph suggest, the court's purported "standing" argument is simply a restatement of the substantive argument that the Navy was entitled to discharge Mr. Steffan on the basis of "conduct" or "intent" inferred from his bare admission of homosexuality.

rationality review would be tantamount to no review at all—a result manifestly inconsistent with Supreme Court precedent. *See, e.g., Zobel v. Williams,* 457 U.S. 55, 61–64, 102 S.Ct. 2309, 2313–15, 72 L.Ed.2d 672 (1982); *Moreno,* 413 U.S. at 533–38, 93 S.Ct. at 2825–27 (1973).

At the same time, however, rationality review imposes no burden on the government to make any particularized justification of its behavior. So long as the action taken is in fact reasonable, the government need not make findings or produce evidence to support its decision. *Heller v. Doe,* —— U.S. at ——, 113 S.Ct. at 2643. Before striking down a statute or regulation on rationality review, the court must find wanting any justification actually proffered by the government, as well as other potentially legitimate grounds for the action. *Id.* at —— – ——, 113 S.Ct. at 2642–43.

The presence of a military branch as defendant in equal protection litigation does not eviscerate the courts' role. It is certainly true that we accord great deference to the judgment of military decisionmakers within their areas of expertise. For example, in *Goldman v. Weinberger,* 475 U.S. 503, 508, 106 S.Ct. 1310, 1313–14, 89 L.Ed.2d 478 (1986), the Supreme Court upheld this court's ruling that a military prohibition on servicemembers wearing yarmulkes survived strict scrutiny, although the regulation would likely have been struck down as violative of the First Amendment in other contexts. In effect, the Court deferred to the military's judgment that its interest in uniformity of dress—which may not have been even an "important" governmental interest in another context—rose to a "compelling" level in the military. Surely the military itself is most competent to determine whether uniformity of dress is merely "important" or positively "compelling" in the military context.

Steffan's case presents quite a different picture, however. Steffan has conceded, "for today," that keeping individuals who engage or intend to engage in homosexual conduct out of the military is a "legitimate" interest. The issue here is thus limited to whether the government may "rationally" infer past or future conduct from Steffan's admission of "homosexuality." The military has no special competence to decide this question. To the contrary, reviewing the "rationality" of such inferences—with attendant legal consequences—drawn from status to conduct falls more properly within the expertise of the courts. Such analyses are an important part of our work. *See, e.g., Aptheker v. Secretary of State,* 378 U.S. 500, 509–11, 84 S.Ct. 1659, 1665–66, 12 L.Ed.2d 992 (1964) (government cannot punish status of Communist on the theory that subversive conduct would follow); *Robinson v. California,* 370 U.S. 660, 667, 82 S.Ct. 1417, 1420–21, 8 L.Ed.2d 758 (1962) (disallowing punishment of drug addicts, absent evidence of drug use). We therefore decline the government's invitation to establish the military branches as ultimate arbiters of the "rationality" of their inferences under the Equal Protection Clause. With due respect for military expertise in appropriate areas, we employ the traditional rational basis tools in this situation.

We must, however, take issue with the majority's assertion that we hold the mistaken view that "the government's position is weakened if it does not produce evidence to support ('demonstrate') its regulatory proposition." *See* Maj. op. at 685, 689–90. No such thing. Our position is that the inferences drawn in the regulations are not *in fact* rational ones—we do not rely on any argument that the government has failed to support them with evidence. In particular, as we explain in greater detail later, there are fundamental impediments deeply rooted in our constitutional jurisprudence that will not permit the government to treat a servicemember's statement of homosexual identity as a proxy for proscribed homosexual conduct. Governmental actions predicated on such a presumption must therefore fail rational-basis review, quite apart from evidentiary disputes. That the government has never tried to demonstrate—either in this case or in any other case upon which the majority relies—that its inference of homosexual conduct following from an admission of orientation is rooted in "realit[y]," *see Heller v. Doe,* —— U.S. at ——, 113 S.Ct. at 2643, serves only to reinforce our view of its basic irrationality.

E. *Inferring Future Homosexual Conduct From "Homosexuality"*

Although the questions of whether the Navy may infer past or future homosexual conduct from an admission of homosexuality are closely related, the history of this case requires that we address them separately. Inferring future homosexual conduct from an admission of homosexuality presents the now-familiar "propensity" issue—whether the admission itself indicates that an individual will "one day" actually engage in proscribed homosexual conduct.

We address this question in three parts. Initially, because the majority's analysis rests almost entirely on its untenable conflation of homosexual status and homosexual conduct, *see* Maj. op. at 689–90, we emphasize that this view has been rejected both by the military itself and by expert authority. We then demonstrate that, particularly in the military, there is no "rational connection" between orientation/status and conduct as a factual or experiential matter. Finally, we point out that even if a rational connection between these concepts could be shown, the Constitution prohibits presuming, on the sole basis of an admission of homosexual status, that a servicemember will "one day" violate military regulations governing sexual conduct.

1. *Military and Expert Recognition of the Orientation/Conduct Distinction*

The military itself recognizes a fundamental distinction between homosexual orientation and homosexual conduct. The DOD Directives under which Steffan was separated expressly distinguish between them:

Homosexual means a person, regardless of sex, who engages in, desires to engage in, or intends to engage in homosexual acts....

DOD Directive 1332.14(H)(1)(b)(1). Because the Directives' inclusion of individuals with homosexual "desires"—as distinct from those who engage or intend to engage in homosexual conduct—would otherwise be wholly redundant, the Directives clearly embrace an orientation/conduct distinction.[13] Indeed, the military has taken action against servicemembers on the basis of orientation alone. *See, e.g., Selland v. Aspin,* 832 F.Supp. 12, 13 (D.D.C.1993) (quoting the General Counsel of the Defense Department as advising the Attorney General of two separations "based only on acknowledged homosexual 'status,' as opposed to homosexual conduct").

Second, an orientation/conduct distinction is found in the Secretary's interpretation of the very DOD Directives under which Steffan was separated. In his brief to the *in banc* court, the Secretary acknowledges that under these regulations status ought not be conflated with conduct. He counsels the court not to read the regulations to require discharge in every case when a servicemember states that he is a homosexual. Instead, the Secretary asks us to read into the regulations a "rebuttable presumption" for celibate homosexuals.[14] The Secretary obviously appreciates the irrationality—even under the "old" regulations at issue in this case—of a rigid rule equating homosexual orientation and conduct.

Third, the military's recognition of the distinction between homosexual orientation and conduct rises to a full-blown status in the Secretary's newest policy on homosexuals in the military. On July 19, 1993, after Steffan's separation, the Secretary issued a memorandum to the Defense Department command structure, stating:

[I]t is the policy of the Department of Defense to judge the suitability of persons to serve in the armed forces on the basis of their conduct. Homosexual conduct will be grounds for separation from the military

---

**13.** It is a settled rule of statutory and regulatory construction that, where possible, each term should be given independent meaning. *See Weinberger v. Hynson, Westcott and Dunning, Inc.,* 412 U.S. 609, 633, 93 S.Ct. 2469, 2485, 37 L.Ed.2d 207 (1973).

**14.** Essentially, the Secretary claims that the DOD regulations give rise to a "rebuttable presump-

tion" because even an individual who claims that he or she is a "homosexual" may remain in the service if there is a "further finding" that he or she is not a "homosexual." *See* Appellees' Brief at 688–90. We later explain our view that the language of the regulations as applied to Steffan simply will not bear the Secretary's construction. *See infra* at 696–98.

services. Sexual orientation is considered a personal and private matter, and homosexual orientation is not a bar to service entry or continued service unless manifested by conduct.

Department of Defense, "Policy on Homosexual Conduct in the Armed Forces," *cited in* Brief for Appellee, Addendum at 1, *Steffan v. Aspin*, 8 F.3d 57 (D.C.Cir.1993). The most recent policy not only explicitly acknowledges the distinction between homosexual status and homosexual conduct, but, even more significantly, admits that homosexual orientation by itself is *not* incompatible with military service. *See* DOD 1332.14(H)(1)(a) (Dec. 21, 1993) ("[S]exual orientation is considered a personal and private matter, and homosexual orientation is not a bar to continued service ... unless manifested by homosexual conduct....."). The new DOD Directives no longer include any reference to "desires"; they focus instead exclusively on homosexual conduct and the intent to engage in such conduct. *Id.*

Particularly in light of this change in the military's stance toward homosexuality per se—which we must assume represents the result of the military's best reasoning and experience [15]—we can only be stunned by the court's attempt to justify as rational a conflation of conduct and orientation that it attributes to the military, but that the military may never have endorsed and has now explicitly forsworn.[16] This flaw infects all the stages of the majority's "rationality" analysis.

Indeed, several recent court decisions have criticized this position of the majority and the cases on which it relies, *see, e.g., Ben–Shalom v. Marsh*, 881 F.2d 454 (7th Cir.1989), on the ground that they offer no convincing rationale. In the words of one jurist, *Ben–Shalom* "abandoned explicitly the distinction between orientation and conduct which has been stressed in other cases.... without any evidence in the case before it and without citation to authority of any kind." *Jantz v. Muci*, 759 F.Supp. 1543, 1547 n. 2 (D.Kan. 1991) (emphasis added), *rev'd on other grounds*, 976 F.2d 623 (10th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993).[17] The contrary view, in contrast, has documented support. In *Cammermeyer v. Aspin*, 850 F.Supp. 910, 919 (W.D.Wash.1994), the district judge pointed to "substantial uncontroverted evidence" in support of his conclusion that "a distinction between homosexual orientation and homosexual conduct is well grounded in fact." The judge reproduced much of this testimony in his opinion, including statements by clinical and research psychologists indicating that "a person's public identification of his or her sexual orientation does not necessarily imply sexual conduct, past or present, or a future desire for sexual behavior." *Id.*

Similarly, the court in *Equality Foundation of Greater Cincinnati v. Cincinnati*, 860 F.Supp. 417, 437 (S.D. Ohio 1994), concluded that "evidence amply established ... that there is a broad distinction between sexual orientation, and sexual conduct," citing expert witness testimony that "[s]exual orientation ... 'is a predisposition towards one's own and/or the other gender' and is not [ ] defined by any conduct." *Id.* Indeed, evidence in *Equality Foundation* demonstrated that "sexual activity is not even necessarily a good predictor of one's sexual orientation." *Id.* Based on this testimony in the record,

---

**15.** The majority's position is in considerable tension with its own assertion of "the special deference we owe the military's judgment...." Maj. op. at 686. Here, the military has determined that conduct and orientation are distinct concepts; for purposes of its own analysis, the court collapses them nonetheless.

**16.** The majority's lengthy citation from Judge Reinhardt's dissenting opinion in *Watkins v. Army* advances its cause hardly at all. 847 F.2d 1329, 1361 n. 19 (9th Cir.1988) (suggesting that the class of individuals who have a "homosexual orientation" is somehow "define[d]" by "homosexual conduct"); *accord Ben–Shalom v. Marsh*,

881 F.2d 454, 464 (7th Cir.1989). Judge Reinhardt's position was roundly rejected by the *Watkins* majority itself, *see* 847 F.2d at 1346–47, and is unsupported.

**17.** Judge Kelly also noted that the Ninth and Federal Circuits have made similar statements. Both, "without citation to any evidence in the record or to a single medical authority" have announced that "[h]omosexuality ... is behavioral." *Jantz*, 759 F.Supp. at 1547 n. 3 (1990), quoting *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 573 (9th Cir. 1990); *Woodward v. United States*, 871 F.2d 1068, 1076 (Fed.Cir.1989).

the court explicitly rejected the "fundamental underpinning of [*Ben–Shalom, Woodward,* and *High Tech Gays* ]—that homosexuality is a status defined by conduct." *Id.*

## 2. *The Lack of Any "Rational" Factual Connection Between Orientation and Conduct*

Given, then, that homosexual orientation and conduct are analytically distinct concepts, the "propensity" question reduces to whether an admission of homosexuality alone, without elaboration of any kind, may rationally give rise to an inference that a particular individual will "one day" engage in homosexual conduct, regardless of the inhibitions of his or her environment. Neither the majority nor the government offers any indication that such a presumption is rooted in reality. The government's brief baldly claims that there is a "sound factual connection between the proved and inferred facts," Appellees' Brief at 15, but offers no further support for this proposition. At oral argument, the government repeatedly relied on the incantation that the "nature of human sexuality" supported the inference. *In Banc* Transcript at 49, 55, 62, 68. The majority, for its part, simply declares: "[W]e are persuaded that in this case the correlation is more than sufficient to justify the government's policy." Maj. op. at 688.

We are not "persuaded." The government's contention in this case smacks of precisely the sort of stereotypical assessment forbidden by *Stanton* and *Reed, see supra* at 688; at bottom, the government and the majority seem to be saying that gay servicemembers—unlike heterosexuals—must be presumed incapable of controlling their sexual "desires" in conformity with the law.[18] While the government is not obliged to offer evidence to support the rationality of an inference, neither are courts obliged to accept the naked assertion of an untenable position.

The irrationality of the government's inference is particularly patent in the military, where homosexual conduct is grounds for automatic discharge and, in the case of homosexual sodomy, punishable by incarceration. Indeed, it is much more reasonable to infer that a servicemember who admits to "homosexuality" will thereafter assiduously forego homosexual conduct. After all, servicemembers are surely aware that statements of homosexual orientation or desire will trigger close scrutiny of their subsequent behavior for evidence of homosexual "conduct" or "intent," as indeed occurred in Steffan's case.[19] It would be foolhardy for servicemembers to freely admit "homosexuality," unless they were quite confident that no additional evidence of conduct or intent existed. ˙

The Ninth Circuit is in agreement with this view, and has interpreted the regulation at issue here as not reaching simple, unadorned admissions of homosexuality. In so doing, it cited numerous inconsistencies in the military's position that raised, in the court's view there, serious doubts about the "rationality" of the same inference urged upon us here. In *Meinhold,* 34 F.3d at 1478 n. 11, Judge Rymer noted that when an individual admits or has been found to engage in *past homosexual acts,* the military does not necessarily infer future homosexual conduct. Rather, so long as certain "approved findings" are made—including that the individual no longer "desires" to engage

---

**18.** The majority's attempt to explain this irrational difference ˙ in treatment on the ground that "heterosexuals have a permissible outlet for their particular sexual desires whereas homosexuals in the military do not," Maj. op. at 692, is undercut by the military's own definition of "homosexual," which includes individuals who admit to being "bisexual." DOD Directive 1332.14(H)(1)(b)(2). Bisexuals obviously have a "permissible outlet for their sexual desires."

Moreover, recent events belie the notion that because heterosexuals have a "permissible outlet for their particular sexual desires," their "desires" are less likely than those of homosexuals

to translate into forbidden conduct. Five West Point football players are currently facing charges of "groping" female cadets during a pep rally; seventy-six percent of the 1993 class of women cadets there report experiencing some form of harassment. Eleanor Randolph, *Army Players are Accused of 'Groping,'* Washington Post, Nov. 2, 1994, at A1 & A16. Under Academy disciplinary rules, the most severe punishment the accused athletes face for their alleged misconduct is suspension for ninety days. *Id.*

**19.** For three months after the initial admission, the NIS unsuccessfully sought evidence of homosexual conduct on the part of Mr. Steffan.

in homosexual acts—the DOD Directive permits such servicemembers to remain in the military. DOD Directives 1332.14 and 1332.30. Judge Rymer correctly concludes that it is not "wholly rational" to infer future homosexual conduct from a mere statement of "homosexuality" at the same time a similar inference is not necessarily made from past homosexual conduct by professed heterosexuals.

The *Meinhold* court also observed that the military's "propensity" inference treated homosexuals and heterosexuals differently for no reason. Judge Rymer wrote:

> Although courts defer to the military's judgment about homosexual conduct, and classifications having to do with homosexuality may survive challenge if there is any rational basis for them [citations omitted], at least a serious question is raised whether it can ever be rational to presume that one class of persons (identified by their sexual preference alone) will violate regulations whereas another class (identified by their preference) will not.

*Id.* at 1478. It is telling that the majority does not seriously attempt to distinguish *Meinhold*, but rather limits its criticism of the holding to two points of secondary importance. *See* Maj. op. at 687 n. 7 (definition of the class of persons at issue) & 694 (exhaustion of remedies).

### 3. *The Constitution Prohibits Inferring Proscribed Conduct*

Finally, and most fundamentally, presuming that servicemembers who admit to homosexual orientation will inevitably violate military regulations conflicts with bedrock principles of our legal and constitutional order. For that reason, it is inherently irrational.

The Supreme Court has repeatedly emphasized that even prior *conduct* does not demonstrate a "propensity" to engage in the same actions after they later become illegal. *See, e.g., Jacobson v. United States,* —— U.S. ——, ——, 112 S.Ct. 1535, 1542, 118 L.Ed.2d 174 (1992) ("Evidence of predisposition to do what once was lawful is not, by itself, sufficient to show predisposition to do what is now illegal, for there is a common understanding that most people obey the law even

when they disapprove of it."). And if prior *conduct* does not permit an inference regarding future conduct, such a conclusion is still less justifiable when based on mere orientation or "desire." "[A] person's inclinations and 'fantasies ... are his own and beyond the reach of government...." *Id.* (quoting *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 67, 93 S.Ct. 2628, 2641, 37 L.Ed.2d 446 (1973)). Indeed, as Justice Marshall wrote in *Stanley v. Georgia,* 394 U.S. 557, 565, 89 S.Ct. 1243, 1248, 22 L.Ed.2d 542 (1969), "Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds." Clearly the Navy may not exercise this power over the minds of servicemembers by discharging them on the basis of inquiries about "homosexuality."

The "constitutional heritage" to which Justice Marshall referred in *Stanley* is evident in the evolution of the law of treason. Under a statute of Edward III, it was a crime to "compass or imagine the Death of ... the King." Statute of Treasons 25 Edw. III. This became the crime of "constructive treason," which was enforced against supposed "compassers" and "imaginers" even when no overt act (other than mere words) or agreement corroborated an intent to carry out the regicide. *See, e.g. Case of Thomas Burdet,* 79 Eng.Rep. 706 (1477); *Trial of Sir John Perrot,* 1 How.St.Tr. 1315, 1318 (1592); *Trial of Thomas Hardy,* 24 How.St.Tr. 199, 894 (1794) (all cited in *Watts v. United States,* 394 U.S. 705, 709–10 & n. 1 (1969) (Douglas, J. concurring)).

Our Constitution expressly repudiates constructive treason. Article III, section 3 declares: "treason against the United States Shall consist *only* in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No person shall be convicted of Treason unless on the Testimony of two Witnesses to the same *overt Act,* or on Confession in open Court." U.S. CONST. art. III, § 3 (emphasis added). The restrictions imposed by our Constitution, limiting the definition of treason to particular conduct and requiring an "overt act" for conviction, express the fundamental constitutional principle that a person's thoughts are his own—

however distasteful they may be to the state or to the populace.

This same principle was accepted even in the cases that upheld the Smith Act's broad proscriptions of subversive activities. Despite the nation's widespread fears of Communist threats to overthrow the state, the Supreme Court never allowed prosecutions merely for private Communist sympathies. For example, in *Scales v. United States,* 367 U.S. 203, 221–24, 81 S.Ct. 1469, 1482–84, 6 L.Ed.2d 782 (1961), the Supreme Court construed the Smith Act's "membership clause" to allow conviction only upon proof of both "active membership" in a communist-affiliated organization and a "specific intent" to overthrow the Government of the United States. Only if intent accompanied membership, the Court held, would the statute be brought "within established, and therefore presumably constitutional standards of criminal imputability." *Scales,* 367 U.S. at 228, 81 S.Ct. at 1485. Any broader construction would render the statute constitutionally doubtful. *Id.* at 222, 224, 81 S.Ct. at 1482, 1483–84.

Similarly, in *Dennis v. United States,* 341 U.S. 494, 499–502, 71 S.Ct. 857, 862–63, 95 L.Ed. 1137 (1951), the Supreme Court construed the subversive advocacy provisions of the Act to require both specific conspiratorial intent to overthrow the government at some future date, and active advocacy of (as opposed to a mere statement of support for) that position. Later, as the nation's fear of domestic communism waned, the Supreme Court in *Aptheker v. Secretary of State,* 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964), reasserted its view that mere "thoughts and desires"—as evidenced by membership in a "subversive organization"—could never be sufficient grounds for deprivation of civil rights. In *Aptheker,* the Court held unconstitutional a law that indiscriminately deprived Communist Party members of their passports. *Id.* at 509–11, 84 S.Ct. at 1665–67. *Cf. Robinson v. California,* 370 U.S. 660, 665–67, 82 S.Ct. 1417, 1419–21, 8 L.Ed.2d 758 (1962) (unconstitutional to criminalize narcotics addiction in absence of proof of use); *Powell v. Texas,* 392 U.S. 514, 532–36, 88 S.Ct. 2145, 2154–56, 20 L.Ed.2d 1254 (1968) (upholding conviction for public intoxication because it was based on conduct, not status as chronic alcoholic).

Thus, even Cold War fears of internal subversion could not induce the Supreme Court to countenance the kind of presumption that the government argues and the majority adopts here—an inference of future misconduct on the basis of an admission of inchoate "desire," unaccompanied by any specific intent to engage in misconduct. Such an inference is repugnant to time-honored legal principles that guard the sanctity of a person's "thoughts and desires" against governmental control.

Indeed, numerous circuits have already applied this axiom to homosexual status in the context of gay and lesbian student groups denied recognition by state universities. The universities argued that because such organizations would encourage homosexuals to congregate and fraternize, they would facilitate the commission of criminal acts—homosexual sodomy or "deviate" sex acts. See *Gay Students Org. of Univ. of New Hampshire v. Bonner,* 509 F.2d 652, 662 (1st Cir. 1974); *Gay Alliance of Students v. Matthews,* 544 F.2d 162, 166 (4th Cir.1976); *Gay Lib v. University of Missouri,* 558 F.2d 848, 853 (8th Cir.1977). Therefore, the universities contended—much like the military here—they could deny university recognition to inhibit anticipated offensive behavior. The courts roundly rejected this line of argument. The Fourth Circuit, for example, wrote that while "the University could constitutionally regulate [ ] conduct," its argument for denying official recognition to homosexual groups on campus could not be squared with the Supreme Court's holding in *Robinson* prohibiting punishment for status. *See Gay Alliance,* 544 F.2d at 166 (citing *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962)); *see also Gay Lib,* 558 F.2d at 856 (university cannot "ascribe singularly evil connotations to the group simply because they are homosexuals"); *Gay Students,* 509 F.2d at 662 ("speculation that individuals might at some time engage in

illegal activity is insufficient to justify regulation by the state").[20]

The majority's attempt to analogize this case to *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), upholding a mandatory retirement age of 50 for police officers on the ground that it rationally furthered a legitimate purpose of excluding officers lacking necessary physical fitness, misses the mark, as do its other examples of height and blindness disqualifications from government service. Of course the Navy can exclude individuals based on disqualifying physical or mental characteristics beyond their control. It is, however, an altogether different proposition to predicate exclusion on the assumption that certain individuals will not exert their will to prevent mere "desires" from translating into illegal actions.

To put the argument plainly, there is nothing a blind or tall person can do to negate those characteristics that disqualify him from military service. There is no will power that will spare an aging person the eventual loss of physical ability. And certainly there is no way that these people merely by conforming to the law can qualify for military service. But a servicemember who has homosexual desires can; he need only refrain from engaging in prohibited homosexual conduct, and by the Navy's own admission he will be as "fit" as the next person.[21] Since a decision not to act is within the control of the individual servicemember—unlike the "decision" whether to age or be blind—it is not rational to assume that he will choose to engage in conduct that would subject him to discharge or even incarceration.[22]

The majority's citation to *New York Transit Authority v. Beazer*, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979), is no more convincing. In *Beazer*, the Supreme Court upheld a regulation disqualifying methadone users who had formerly been heroin addicts from employment with the NYTA. But two crucial elements of *Beazer* are absent from Steffan's case. First, the district court there had found that methadone use itself can cause "drowsiness, insomnia, excess sweating, constipation, and perhaps some other symptoms." 440 U.S. at 588 n. 32, 99 S.Ct. at 1367 n. 32. The exclusion policy for methadone was thus based, at least in part, on a lack of current capacity to perform at an appropriate level, not solely on a prediction of future misconduct. In addition, even had *Beazer* involved such a prediction, evidence of past misconduct (heroin use) might have lent some support to the inference. A servicemember's mere admission of "homosexuality," on the other hand, carries with it no inference of past conduct; indeed, such statements will likely be made only when no evidence of past or intended misconduct exists.

**20.** The majority's protest that the cited cases involve the First Amendment, Maj. op. at 692, misses our point. The fundamental due process notion that the Constitution prevents the government from inferring that individuals will one day engage in proscribed conduct on the sole basis of their homosexual orientation is unaffected by the level of scrutiny applied in a given case.

Moreover, as the *Gay Alliance* court's reliance on both First Amendment and equal protection rationales suggests, *see* 544 F.2d at 167, a line between the First Amendment and equal protection harms wreaked by the government's discriminatory treatment of individuals admitting homosexual orientation may not so facilely be drawn. Although Mr. Steffan has chosen to frame his case in equal protection terms, he might well have challenged the government's attempt to control his speech on sexual identity on First Amendment grounds. *See* David Cole & William Eskridge, Jr., *From Hand–Holding to Sodomy: First Amendment Protection of Homosexual (Expressive) Conduct*, 29 HARV.C.R.–C.L.L.REV. 319 (1994) (detailing the First Amendment problems presented by the military's homosexual ban).

**21.** Throughout these proceedings, the Navy has strenuously urged that "celibate homosexuals" are not subject to discharge. This supposed exception alone casts doubt on the rationality of the inference that those who are homosexual by orientation will fail to exercise their self-control.

**22.** The single piece of evidence in this record regarding what homosexual servicemembers actually do when faced with the prospect of harsh penalties for homosexual conduct can be found in Dr. Richard Green's Declaration to the District Court. Dr. Green, a Professor of Psychiatry at UCLA, asserted that "substantial anecdotal evidence [suggests] that during World War II, gays in the military simply refrained from engaging in homosexual conduct in order to avoid the harsh penalties that could be imposed" (J.A. 1137, citing COMING OUT UNDER FIRE: THE HISTORY OF GAY MEN AND WOMEN IN WORLD WAR TWO (Free Press, 1990)).

Finally, the majority suggests that the constitutional prohibition against inferring illegal conduct from mere thoughts or desires does not apply in a case not involving "criminal punishment," but only an "employment decision[ ]." Maj. op. at 682. The majority is mistaken. It is just as irrational and fundamentally unfair for the government to draw such an inference in the "employment" context as in any other. Indeed, the Supreme Court's decisions indicate that the government may *neither* punish *nor* make "employment decisions" solely on the basis of citizens' political affiliations or membership in "subversive organizations." *See Elrod v. Burns,* 427 U.S. 347, 372–73, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976) (prohibiting dismissal of non-policymaking county employees based on political affiliation); *Elfbrandt v. Russel,* 384 U.S. 11, 17–19, 86 S.Ct. 1238, 1241–42, 16 L.Ed.2d 321 (1966) (invalidating law denying employment on grounds of membership in subversive organization). *Cf. Meinhold,* 34 F.3d at 1478 (pointing out "the constitutionally significant danger of making status a surrogate for prohibited conduct").

Stripped down, the majority's distinction is constitutionally unpalatable. Any government action with serious civil or economic consequences for an individual admitting homosexual (as opposed to heterosexual) "desire," predicated on the assumption that only the homosexual individual will violate government regulations prohibiting certain behavior, is equally defective.

## F. *Inferring Past Conduct From an Admission of "Homosexuality"*

The majority advances the alternative position that the Navy could—on the basis of Steffan's admission of "homosexuality"—discharge him for *past* conduct, quite apart from any "propensity" to engage in future conduct. In our view, any assumption of past conduct from such an admission is subject to all the same objections made against inferring "propensity" to future conduct. And more.

---

23. At the Brigade Military Performance Board hearing convened to review Mr. Steffan's situation, Captain Konetzi—the presiding officer—asked Mr. Steffan, "I'd like your word, are you a

A rational connection between an admission of "homosexuality" and homosexual conduct is equally lacking whether the conduct inferred is past or future; and our Constitution prohibits the government from drawing that inference in either case. The Supreme Court's ruling in *Robinson v. California*—holding unconstitutional a state's attempt to criminalize narcotics addiction in absence of proof of use—did not hinge on whether California anticipated future use or suspected past use.

The majority's assertion that the Navy may infer that Steffan "admitted" past conduct when he acknowledged his "homosexuality" is just another variation on the same old theme—twice rejected by this court at earlier stages of this case—that the Navy can "presume" past conduct from his statement, which he is then required to explain away. The majority would place the "burden" on Steffan to have explained what he meant by "homosexual" when he first answered "yes" to the government's inquiry as to whether he was one, and conclude that because he failed to carry that burden, he "really" meant that he had engaged in homosexual conduct. This theory is unacceptable constitutionally, rationally, and indeed borders on sophistry.

It is, moreover, inconsistent with the regulations under which Steffan was "processed." The court seems unable to grasp that there was, under any reasonable reading of the regulations, no "burden" that Steffan could possibly have carried to forestall discharge—and therefore no "presumption" or "inference" of past conduct that could have arisen from his silence. Indeed, nothing Steffan could have said before the Performance Board would have been remotely relevant to his predicament.[23] The DOD directive explains, in the plainest prose, that "[a] member shall be separated . . . if [a] finding is made [that] [t]he member has stated that he or she is a homosexual . . . unless there is a further finding that the member is not a homosexual. . . ." DOD Directive 1332.14.-H.1.c.2. The term "homosexual" is defined

homosexual?" Mr. Steffan responded "Yes, sir." Captain Konetzi then asked, "Do you have anything else to add at this point?," and Mr. Steffan replied, "No, sir."

as "a person, regardless of sex, who engages in, desires to engage in, or intends to engage in homosexual acts." *Id.* at 1332.14.H.1.b.1. Steffan does not now nor has he ever denied that he "stated that he ... is a homosexual," under 1332.14.H.1.c.2. And he has from the outset straightforwardly admitted that he is a person aptly described by the definition of "homosexual" contained in 1332.14.H.1.b.1. Therefore, even had Steffan given all of the explanations and carried all of the "burdens" that the majority can conjure up, he would have gained no advantage whatever. He would still have been a "homosexual" under the regulations and he would still have been turned out of the Navy. Steffan did not "join[ ] the issue," Maj. op. at 695, simply because there was no "issue" to join. As the Navy itself argued to the district court, "Officers who admit that they fit within the Navy's regulatory definition of homosexual are inevitably discharged." *Steffan,* 733 F.Supp. at 120.

The majority does not offer even a colorable explanation why this catch–22 predicament was not controlling in Steffan's case. It argues only that if an individual who admits to being a "homosexual" goes on to explain in detail what he means by "homosexual" in his own case then the military might find that he is not a "homosexual" after all. *See* Maj. op. at 695. It never points to any authority under the old regulation that might have given rise to such a "hope." Far from being "rational," the argument is decidedly circular.

The majority's error is thus one of 20/20 hindsight. As a court deciding a thorny appeal, we might well wish that Steffan had himself articulated the constitutional issue at his original hearing. But Steffan was not a court, nor even an attorney planning a constitutional appeal. He was a midshipman, a man who had dedicated four years to a career in the Navy, and he wished to remain in the Navy. Yet he knew that having once admitted his homosexuality, nothing he could

say would keep him in service, unless it led ultimately to the determination that he was *not* a homosexual. By the plain language of the DOD Directive, no amount of emphasis on the word "desire" would do that. He therefore, quite understandably, said nothing further. The government cannot later—whether two years later, in district court, or seven years later in today's majority opinion—inform Steffan that because he remained silent when further explanations would have been of no avail, his admission of homosexuality became, presumptively, an admission of conduct. It would be the worst kind of due process deprivation to retroactively apply a "presumption" or "inference" not even plausibly suggested by the regulations at the time.[24]

This court has already recognized this fact by rejecting the government's earlier arguments that Steffan's discharge involved homosexual conduct. In *Steffan v. Cheney,* 920 F.2d 74 (D.C.Cir.1990), we reversed the district court's dismissal of the case as a sanction for Steffan's refusal to answer questions about whether he had engaged in homosexual conduct. The district court had found that "[t]he record is clear that [Steffan] was separated from the Naval Academy based on his admissions that he is a homosexual rather than on any evidence of misconduct," but nonetheless held that Steffan's conduct was relevant to his eligibility for reinstatement. *Id.* at 76. We disagreed, stating that because the courts may review administrative action only on the bases contained in the administrative record, Steffan could not be held to answer conduct-related questions "unless [ ] conduct was a basis for his separation." *Id.* at 76. With both the administrative record and the district court's finding before us, we determined that conduct had not been the reason for Steffan's discharge and therefore reversed the district court. *Id.* We also specifically rejected the government's argument that because of a "rebuttable presumption" or "celibate homosexual ex-

24. *Cf. Satellite Broadcasting Co., Inc. v. FCC,* 824 F.2d 1, 3 (D.C.Cir.1987) (Silberman, J.) ("Traditional concepts of due process incorporated into administrative law preclude an agency from penalizing a private party for violating a rule without first providing adequate notice of the sub-

stance of the rule."). There is no indication in the record that Steffan ever received notice of any "rebuttable presumption"; hence, the district court's grant of summary judgment was inappropriate under the circumstances.

ception"[25] in the regulations, Steffan was presumptively caught by the conduct or intent prongs of the regulation until he demonstrated otherwise. The majority's ruling today, that Steffan was discharged on the basis of homosexual conduct, thus effectively reverses the panel decision of four years ago—in the crucial part of the litigation that framed the issue now before us on appeal—that Steffan was not discharged for homosexual conduct, but for status.

Law of the case principles normally require a court to avoid thus disavowing an earlier "legal decision . . . unchallenged in a subsequent appeal when the opportunity to do so existed." *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 250 (D.C.Cir.1987). We recognize, of course, that an *in banc* court is not always "bound by the law of the case established by a panel on an earlier appeal, when that ruling was not reviewed *in banc.*" *See, e.g., Van Gemert v. Boeing Co.*, 590 F.2d 433, 437–38 n. 9 (2d Cir.1978). Nevertheless, law of the case doctrine binds this court even in *in banc* review when "a party would [otherwise] be seriously prejudiced. . . ." *Id.; see also First Nat. Bank of Hollywood v. American Foam Rubber Corp.*, 530 F.2d 450, 453 n. 3 (1976) (law of the case doctrine need not apply *if* "no prejudice results from its omission"). We find it difficult to conceive how prejudice could be greater than that which Steffan suffers from today's reversal of this court's first *Steffan* ruling. It was, after all, as a direct result of that decision that the question whether Steffan had actually engaged or intended to engage in conduct was not joined in the district court. The combination of the first panel opinion and today's majority opinion forecloses any opportunity for Steffan to challenge his discharge on any ground.

G. *Effect on Morale, Discipline, and Recruitment*

Because the majority concludes that Steffan was properly discharged based on an inference of past or future homosexual conduct drawn entirely from his admission of homosexuality, it does not address the legitimacy of other justifications—unrelated to conduct—offered by the government. Under rationality review the regulations pass constitutional muster if any rational basis can justify his discharge. *See Heller v. Doe,* —— U.S. at ——, 113 S.Ct. at 2642–43. Thus we consider the nonconduct rationales proffered.

The first justification offered by the DOD Directive itself is that the mere presence of homosexuals, even those who admit only homosexual orientation or "desire," will have a negative impact on morale, discipline and the recruitment of new servicemembers. The Directives state, in part:

> Homosexuality is incompatible with military service. The presence in the military environment of [homosexuals, later defined to include mere "desirers"] . . . adversely affects the ability of the Military Services to maintain discipline, good order, and morale; . . . [and] to recruit and retain members of the Military Services. . . .

DOD Directive § H.1.a.

The argument appears to be that even if military policymakers did not make the irrational inference that servicemembers who admit homosexual orientation engage in homosexual conduct, the military could nonetheless exclude those servicemembers on the ground that heterosexual servicemembers would be appalled at the requirement that they serve alongside openly gay soldiers—even those who neither engage in homosexual conduct nor intend to do so. We are not told the source of the heterosexual servicemembers' presumed distaste. Perhaps the assumption is that servicemembers would make the same irrational inference of conduct as military policymakers; perhaps it is that members dislike anyone with a homosexual orientation, no matter how he be-

---

**25.** These are two names for the same idea. As the government's attorney explained at oral argument *in banc:* "[W]hat was loosely and perhaps inartfully called the celibate homosexual exception is [] exactly the same point I am making today about rebutting the presumption."

In *Steffan v. Cheney*, the government used the label "rebuttable presumption." In *Steffan v. Aspin*, 8 F.3d 57, 64 (D.C.Cir.1993), *vacated and rehearing in banc granted* (D.C.Cir. Jan. 7, 1994), they gave the argument another try as a "celibate homosexual exception," and we again rejected it.

haves. In either case, the justification is without rational basis.

Under rationality review, we must assume the premise that heterosexuals would not wish to serve with individuals of homosexual orientation to be well-founded, even though we may personally hold a higher opinion of our servicemembers' maturity than do their policymakers. We must accept too the unlikely assumption that forcing heterosexuals to serve with homosexuals will, in fact, lower morale, impair discipline, and discourage enlistment—despite our experience with the utter falsity of similar predictions voiced by opponents of President Truman's 1948 executive order requiring racial integration of the armed forces. *See Dahl v. Secretary of United States Navy,* 830 F.Supp. 1319, 1330 (E.D.Cal.1993) (quoting Defense Personnel Security Research and Education Center, *Nonconforming Sexual Orientations and Military Suitability* at 8–10 (1988)). Still, given all that, it is a cardinal principle of equal protection law that the government cannot discriminate against any class of its citizens solely to give effect to the likes or dislikes of others. Such discrimination plays directly into the hands of bigots; it ratifies and encourages their prejudice.

In *Palmore v. Sidoti,* 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984), the Supreme Court overturned a state court's order that took a child away from her mother and delivered custody to her father solely because the mother had married an African–American. The state court reasoned that the child would be subject to discrimination in her community if she were to live with parents of mixed races. In a unanimous opinion, the Supreme Court held that even if the child's welfare would be impaired, the court could not determine custody on that basis because the decision would give effect to the prejudice of others. This the Constitution would not allow:

> Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect. 'Public officials sworn to uphold the Constitution may not avoid a constitutional duty by bowing to the hypothetical effects of private racial prejudice that they assume to be both widespread and deeply held.'

*Id.* at 433, 104 S.Ct. at 1882.

The Court extended this reasoning to rational-basis review in *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In *Cleburne,* the city had denied a zoning permit to construct a home for the mentally disabled in a residential neighborhood, arguing that neighborhood residents, angered by the presence of the home, would pose a danger to the mentally disabled residents. The Court (citing *Palmore*) rejected this argument as giving effect to irrational private biases, and held that it could not provide a rational basis for denying the permit. *Cleburne,* 473 U.S. at 448, 105 S.Ct. at 3258.

*Palmore, Cleburne* and the fundamental constitutional principle that they embody compel us to reject the government's argument that individuals of homosexual orientation may be excluded from the military because others may be offended or angered by their mere presence. The Constitution does not allow government to subordinate a class of persons simply because others may not like them.

## H. Privacy Rationale

The Directives also offer the justification that the mere presence of individuals of homosexual orientation in the military will invade the privacy of heterosexual servicemembers. DOD Directive § H.1.a. This argument could mean one of two things. The concern is either that homosexual servicemembers will ogle their heterosexual colleagues in close quarters, or that—regardless of whether such ogling takes place—heterosexuals will experience an invasion of personal privacy merely from their own fears.

Neither argument detains us long. The argument that homosexual "desirers" will stare reproduces the flawed presumption that mere thoughts and desires will translate into offensive conduct. The contention that heterosexuals must be protected from their fears of ogling, in turn, replicates the argument that governmental action should be controlled by the prejudices and stereotypes

of third parties. Both purported justifications fail rational-basis review.

## I. *Rationales Not Offered by the Secretary*

The Supreme Court's recent decision in *Heller v. Doe* suggests rationality review must consider whether arguments not proffered by the government might provide a rational basis for the regulations. —— U.S. at —— – ——, 113 S.Ct. at 2642–43. The district court relied on one such justification—preventing the spread of AIDS in the armed forces. The government on appeal has not endorsed this rationale for the military's policy, and neither do we. Homosexual orientation cannot spread the AIDS virus. Homosexual, or heterosexual, *conduct* can— if one participant carries the virus. This justification relies on the illegitimate assumption that homosexual servicemembers will break the rules and engage in prohibited homosexual conduct that may spread the disease, but heterosexuals—to whom sexual conduct is not forbidden—will not pose any such danger.

A final rationale on which the Secretary does not rely, but to which the Directives allude, is the "security" threat posed by homosexuals' alleged susceptibility to blackmail. DOD Directive § H.1.a. As Judge Norris in the Ninth Circuit has aptly pointed out, however, the military's policy *increases* the risk of blackmail by making gays and lesbians remain in the closet for fear of forfeiting their careers.[26] *Watkins v. United States Army*, 875 F.2d 699, 730–31 (9th Cir. 1989) (Norris, J., concurring), *cert. denied*, 498 U.S. 957, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990).

We conclude that the military's discharge of Joseph Steffan on the sole basis of his admission of homosexuality was not rationally related to a legitimate government goal. We disagree with the majority that this case concerns only conduct, whose past or future existence may be inferred solely from the mere acknowledgement of "homosexuality." To permit discharge on the basis of such an inference would contravene both principles of rationality review and constitutional guarantees. Additionally, we find no rational nonconduct justification for the regulations, insofar as they penalize a simple admission of homosexuality. We therefore believe that Steffan should be reinstated into military service, permitted to graduate from the Academy, and commissioned as a military officer.[27]

26. Indeed, although the government offers no evidence that the military's policy decreases the risk of blackmail from external sources, *amici* cite research indicating that the policy increases the opportunities for sexual harassment within the services. A particularly notorious example involved a group of servicemen stationed at Kaiserslautern, Germany, who called themselves "dykebusters." These men reputedly made systematic sexual advances to military women, and reported those who refused as lesbians. *See* Randy Shilts, CONDUCT UNBECOMING: GAYS AND LESBIANS IN THE U.S. MILITARY 496–97 (1993). *See also*, Michell M. Benecke & Kirstin S. Dodge, *Military Women in Nontraditional Job Fields: Casualties of the Armed Forces' War on Homosexuals*, 13 HARV. WOMEN'S L.J. 215 (1990).

27. The Secretary's request for rehearing *in banc* raised the single issue whether this court has the authority to order Steffan commissioned. Specifically, while the Secretary did not question our authority to order Steffan's reinstatement into the Navy and his graduation from the Academy, he claimed that requiring the Navy to commission Steffan somehow intrudes upon the authority granted to the President and the Senate under the appointments clause of the Constitution. U.S. CONST. art. II, § 2 ("The President ... shall nominate, and by and with the Advice and Consent of the Senate, shall appoint ... Officers of the United States....").

We are told that "[e]very physically qualified graduate [of the Naval Academy] is commissioned in the unrestricted line of the Navy or the Marine Corps." NAVAL ACADEMY CATALOG FOR PROSPECTIVE MIDSHIPMEN 51 (1982–83). Indeed, even before graduation, Mr. Steffan himself was as a matter of course nominated for a commission by President Reagan on May 11, 1987. The nomination was then referred to the Senate Armed Services Committee, which reported favorably on May 14, 1987. The Senate thereafter confirmed Steffan's nomination by unanimous consent. 133 CONG.REC. 11,997, 12,033, 12,046, 12,-486, 12,636 (1987).

So far as the record reflects, then, the only impediment to Steffan's receiving his commission was his constructive discharge from the Naval Academy. *See* Appellees' Letter of May 20, 1994 at 1 (any commission prepared for Steffan "would have been ineffective because [he] ... left the Naval Academy prior to completing the academic and military requirements necessary for commissioning"). The Secretary concedes that this court has the authority to remove that impediment by ordering Steffan reinstated

## CONCLUSION

For the government to penalize a person for acknowledging his sexual orientation runs deeply against our constitutional grain. It has, we believe, no precedent or place in our national traditions, which spring from a profound respect for the freedom to think and to be what one chooses and to announce it to the world. The majority's ingenious plays on presumptions and inferences cannot disguise the injustice that lies at the heart of this case. In years to come, we will look back with dismay at these unconstitutional attempts to enforce silence upon individuals of homosexual orientation, in the military and out. Pragmatism should not be allowed to trump principle or the soul of a nation will wither. We respectfully dissent.

and graduated. The specter raised by the Secretary, that the President might then refuse to perform the essentially ministerial duty of hand-

ing over Steffan's commission, appears to be at this juncture a hypothetical case that is unnecessary to resolve.